UNITED STATES of America,
Plaintiff,

v.

Robert B. CRUZ, Jr., and Maria Cruz,
Defendants.

Crim. No. 66–160–SA.

United States District Court
W. D. Texas,
San Antonio Division.

March 7, 1967.

Ernest Morgan, U. S. Dist. Atty., and Andrew L. Jefferson, Jr., Asst. U. S. Dist. Atty., for plaintiff.

Jack Paul Leon, San Antonio, Tex., for defendants.

## MEMORANDUM

GRAVEN, Senior District Judge (By Assignment).

There is presented to the Court for consideration the pretrial motion of the defendants to suppress certain evidence.

On August 24, 1966, the defendants were placed under arrest in their residence in the City of San Antonio, Texas. On September 13, 1966, a Grand Jury for this District returned an Indictment against the defendants. The Indictment is in five Counts. In Counts One, Two and Three of the Indictment the defendants are charged with having violated Section 174, Title 21 U.S.C.A.; also Section 4705(a) and Section 4704(a), Title 26 U.S.C.A., relating to narcotics in connection with six grams of heroin. In Counts Four and Five they are charged with having violated Section 176a, Title 21 U.S.C.A., and Section 4744(a) (2), Title 26 U.S.C.A., relating to narcotics in connection with 13 grams of marijuana and 12 marijuana cigarettes.

On October 27, 1966, the defendants entered pleas of not guilty to all the Counts of the Indictment. On October 31, 1966, they filed the motion to suppress which is here under consideration. A lengthy hearing was held on that motion.

The motion to suppress has two phases. One is the suppression of any confessions, admissions, or statements made by either of the defendants to the arresting officers at or following their arrest. The other is the suppression for use as evidence of certain items seized by the arresting officers in the residence of the defendants at or following their arrest.

It developed at the hearing that the only controversy as to the first phase of the motion has to do with an utterance or ejaculation made by the defendant Robert B. Cruz, Jr., at the time of or immediately following his arrest. The controversy as to the items seized in the residence has to do with 13 grams of marijuana, 12 marijuana cigarettes and $210.00 in currency, the serial numbers of which had been previously recorded.

On August 23, 1966, at around 8:00 p. m., in the 2100 block of West King's Highway in the City of San Antonio, Texas, one Martin Trantham made a sale of four grams of heroin to Marion W. Hambrick, an Agent of the Federal Bureau of Narcotics. At the time of the sale Trantham did not know that Hambrick was such Agent. Immediately following the sale, Hambrick placed Trantham under arrest. Trantham then proceeded to cooperate very fully with Hambrick. Hambrick and Trantham thereupon proceeded to go to the latter's residence at 846 John Adams in the City of San Antonio. Apparently Hambrick had by radio already alerted other Agents of the Bureau of Narcotics and members of the San Antonio Police Department that Trantham had been arrested and that the two of them were proceeding to Trantham's residence.

At the Trantham residence Hambrick was joined by Agents Wilbur V. Plase, Joseph M. Arpaio, and James L. Williams of the Bureau of Narcotics, Detective Manuel Ortiz of the Narcotics Division of the San Antonio Police Department, and Inspector Jack Hutton of the same Department. Upon arrival at his residence Trantham voluntarily went to his bedroom and picked up a gelatin capsule box containing 12 capsules of heroin which he delivered to the Narcotics Agents. He informed the Agents that his source of supply was the defendant Robert B. Cruz, Jr., whom he referred to as Bob Cruz or Bob. He stated that nearly every other day for the past six months he had been purchasing six grams of heroin from Bob Cruz. It is clear that Trantham had undertaken to be an informer. He had not previously been an informer.

The defendant Robert B. Cruz, Jr., and the defendant Maria Cruz, his wife, resided in a residence in the City of San Antonio described as 522 Chupaderas. The Agents for the Bureau of Narcotics had for some time been receiving reports that the defendant Robert B. Cruz, Jr., was engaged in the illegal sale of narcotics.

Commencing soon after his arrival at his residence, Trantham made attempts to get into touch with Bob Cruz in order to make a purchase of narcotics from him under such circumstances as would establish that he was engaged in the sale of narcotics. Trantham made several telephone calls but was unable to locate him. At the Trantham residence there was an extension telephone in his bedroom. With the consent and permission of Trantham, Agents for the Bureau of Narcotics, by means of that extension, monitored all telephone calls made from or coming into the Trantham residence.

At around 1:15 a. m. on the morning of August 24, 1966, Trantham dialed telephone number CApital 7–5798. A man answered the telephone at that number. Trantham began the conversation by asking, "Is this Bob?" The man addressed as Bob answered, "Hello, Martin." Trantham then said, "I would like to score six more grams, and I would like it right now." The person addressed as Bob then instructed Trantham to put $210.00 in currency in the mailbox at his residence "as usual". Trantham said that he did not like the idea of the mailbox. Bob told Trantham not to worry and continued, "My old lady will get the money from the mailbox after everybody is gone, and she can watch the mailbox

from the window of the house." Bob then said, "I just remembered, I don't have any with me right now. It is going to have to wait until early morning." Trantham then said he wanted the six grams right away. Bob then said, "I know we have been doing business like this for a long time, and I have never messed you up before. However, I am a businessman with this stuff. And I am fat enough in the business to do it my way." At about 1:25 a. m. the telephone rang at the Trantham residence. Trantham answered the call. The person calling began the conversation by saying, "This is Bob again. I just called my man, and he will have the six grams over here in about ten minutes." Bob then informed Trantham that as soon as he had put the six grams in the mailbox he would call. Trantham repeated the instructions previously given him by Bob and then asked, "Will it be $210.00, as usual?" Bob replied, "Yeah, two hundred ten, as usual." Following the second telephone call, Agents Plase and Williams, together with some of the members of the San Antonio Police Department, left the Trantham residence to keep the Cruz residence under surveillance. At around 3:30 a. m. a telephone call came to the Trantham residence. Trantham answered. The speaker said, "The stuff is in the mailbox." Shortly before Agent Williams saw Bob Cruz in and around the front of his residence. Following the last telephone call, Agent Hambrick then got into Trantham's car and was driven by him to a point not far from the Cruz residence. Agent Arpaio and some of the San Antonio police officers followed in other cars. When the stop was made by Trantham and Hambrick, the latter gave the former $210.00 in currency. Prior thereto the serial numbers thereof had been recorded. Then Agent Hambrick got into the trunk of Trantham's car, leaving the lid open just far enough so that he could see out. Trantham then drove his car to the front of the Cruz residence where he parked it. He then got out and proceeded to the mailbox. He removed a package from the mailbox, put the $210.00 in currency in

it, then returned to the car and when it was requested of him delivered the package to Hambrick. Trantham was searched upon his return and no currency was found on him. Immediately upon the return of Trantham to the car, Hambrick radioed the other Agents and the police officers telling them he would advise them further as soon as he had tested it. It was then around 4:25 a. m. Trantham and Hambrick proceeded by car a distance away from the Cruz residence where Hambrick tested the contents of the package by what is known as the Marquis Reagent Test. That test, which takes only a few seconds to make, reveals whether the substance being tested is or is not heroin. The test showed that the contents of the package was heroin. Hambrick immediately radioed the other Agents and the members of the San Antonio Police Department that the test showed that the package contained heroin.

Agent Plase had the Cruz residence under surveillance before and after the package of heroin was left in the mailbox. After Trantham had taken the package of heroin from the mailbox and left the $210.00 in currency in it, Agent Plase saw a woman come out of the Cruz house. She walked to the mailbox. Agent Plase then heard a clang. The woman then reentered the house.

The sale of the heroin constituted a felony under both State and Federal statutes. That felony was not completed until the seller or sellers thereof had secured the purchase price thereof. The act of securing the purchase price was the last of a series of acts necessary for the consummation of the felony. All of those acts were performed in accordance with the instructions of Bob Cruz.

It appears that following the taking of the money from the mailbox the situation was that either a felony had been committed in the presence of the Narcotics Agents or they had probable cause for believing that a felony had been committed by the occupants of the Cruz residence.

Following the test which showed that the package left in the mailbox at the Cruz residence was heroin and from what preceded it, the Narcotics Agents then had probable cause for believing that the Cruz residence was a distribution point for the illegal sale of narcotics and that contraband, i. e., illegally possessed narcotics, was being kept in the residence.

The defendants make what appear to be alternative contentions. They first contend that the Narcotics Agents did not have probable cause for arrest at the time the arrests were made. They contend that earlier in the evening or morning the Narcotics Agents had such information as would give them probable cause for arresting the defendants or for the obtaining of a search warrant, but they delayed in so doing to their prejudice. In the case of Hoffa v. United States (1966), 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374, a complaint was made by a defendant that his arrest had been delayed to his prejudice. The Court rejected that complaint. It stated (p. 310 of 385 U.S., p. 417 of 87 S.Ct.):

"* * * There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment, if they act too soon, and a violation of the Sixth Amendment if they wait too long. * * *"

In the present case if the Narcotics Agents prior to the completion of the sale had been able to secure the issuance of a search warrant, the search made thereunder would have been challenged as having been issued without probable cause since the challenge of lack of probable cause is made to the arrest and incidental search following the completion of the sale. Under the doctrine of the case of Hoffa v. United States, supra, the Narcotics Agents were not required to guess at their peril whether they had legal probable cause for a search of the residence prior to the completion of the sale. Following the test which showed that heroin was being supplied from the Cruz residence and the previous taking into that residence of $210.00 in currency, the Narcotics Agents were faced with the probability that upon knowledge of the proposed entry by officers being gained by the occupants of the residence they might quickly and easily dispose of or successfully hide the currency and the narcotics on hand.

The Narcotics Agents were also confronted with another troublesome feature. They had previously been warned by several members of the San Antonio Police Department, including Inspector Hutton and Detective Ortiz, that the defendant Bob Cruz was a dangerous man who was known to keep a loaded pistol in his residence and that they would have to watch out in making entry into his residence.

The further situation then was that the Narcotics Agents were presented with the task of arresting a man on a charge which carried with it on conviction a long mandatory prison sentence, who was known to be a dangerous man and who would presumably have a deadly weapon available. The Narcotics Agents with the assistance of members of the San Antonio Police Department proceeded to the arresting of Bob Cruz and the other occupants of the residence. Agent Arpaio and Inspector Hutton went to the front door. Agent Plase and Detective Ortiz went to the back door. Upon arriving at the front door Agent Arpaio banged loudly on it and called out in a loud voice: "Federal Narcotics Agents and City Police. You are under arrest." Agent Arpaio and Inspector Hutton then heard what sounded like scuffling or rustling; they also heard a bang like something hitting or falling on the floor. After waiting about 15 seconds Agent Arpaio pulled the screen door loose from its hook, forced the lock on the door, and he and Inspector Hutton entered the residence. As soon as Agent Plase heard the forcible entry at the front door he forced his way by the back door. After entering the residence, Agent Arpaio and Inspector Hutton proceeded to a bedroom. Bob Cruz was standing up inside that

room. He was in his underwear. Maria Cruz was covered up in bed. Agent Arpaio informed them that they were under arrest. At or about this time Agent Arpaio observed on the top of a dresser in the room an open cigarette package containing what appeared to be marijuana cigarettes and which later proved to be such. There were 12 marijuana cigarettes in the package. Agent Arpaio seized them. Thereafter he quickly opened the top drawer of the dresser and found therein a .38 caliber pistol and the $210.00 in currency previously left in the mailbox. As he was taking the currency from the drawer, Bob Cruz ejaculated: "That is my money. I just collected it." Agent Arpaio then asked him if it was his money and he said it was. It is that ejaculation and the question and answer which immediately followed it and which in substance was a repetition of the ejaculation which the defendants Cruz wish to suppress. At the time Bob Cruz made the ejaculation he was in custody, and up to that time he had not been given any warnings of the kind required to be given in the case of custodial interrogation within the rule in the case of Miranda v. State of Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. At the time of the making of the ejaculation and the asking and answering of the question connected with it, the arresting officers had not commenced any interrogation of either of the defendants. At the time of the arrests and immediately following, the officers were concerned with moving quickly to seize the deadly weapon which Bob Cruz would presumably have available, the $210.00 in currency, and the narcotic drugs in the immediate proximity. Later when the arresting officers were ready to proceed with the interrogation of the defendants, the *Miranda* warnings were given them. However, the Government does not propose to offer any evidence as to any statements made by either of the defendants, except the ejaculation of Bob Cruz referred to and the question and answer connected with it. Therefore, the matter as to what was said by the defendants, or either of them, following the ejaculation and question and answer referred to is not of pertinence.

■ In the opinion of Miranda v. State of Arizona, supra, what was involved was "custodial interrogation" without proper warnings. Where an officer having a person in custody proceeds to interrogate such person, he is asking questions the answers to which might incriminate such person. The Court in Miranda v. State of Arizona, supra, makes it clear that it is self-incrimination which is involved where an arresting officer proceeds to interrogate a person in custody. In that case it was stated (p. 444 of 384 U.S., p. 1612 of 86 S.Ct.) : "Prior to any questioning, the person must be warned * * *." Therefore, before proceeding with questions the answers to which might incriminate such person, the arresting officer is required to give him proper warnings. If the arresting officer has not attempted or is not attempting to have the arrested person incriminate himself, there would seem to be no need of such warnings. Therefore, it seems clear that volunteered, spontaneous, and freely made utterances made by an arrested person would not come within the scope of the rule of Miranda v. State of Arizona, supra.

■ It is the finding of the Court that the ejaculation made by Bob Cruz was volunteered, spontaneous and freely made prior to any attempted interrogation by the arresting officers.

It is the holding of the Court that the said ejaculation and the question and answer which were a repetition of it are not properly subject to suppression.

The matter of suppression of certain items which were either seized or searched for and seized in connection with the arrests of the defendants will be next considered.

It was heretofore noted that at or immediately following the arrest of the defendants Agent Arpaio seized 12 marijuana cigarettes in open sight on top of the dresser in the bedroom and that he

had searched for and seized the pistol and $210.00 in currency in the top drawer of the dresser.

Immediately following the above, the officers proceeded to search the dining room in the house which apparently was an adjoining room. A search of that room disclosed a Prince Albert tobacco can on the top of a cabinet which when opened was found to contain 13 grams of marijuana.

The defendants seek to suppress for use in evidence the 12 marijuana cigarettes, the 13 grams of marijuana, and the $210.00 in currency.

The heroin sold to Trantham is the subject matter of the first three Counts of the Indictment. As heretofore noted, the $210.00 in currency was the fruit of that sale. The 12 marijuana cigarettes and the 13 grams of marijuana are the subject matter of the Fourth and Fifth Counts of the Indictment.

■ A search of the house revealed the presence of several pistols, including a derringer, in addition to the pistol found in the top drawer of the dresser in the bedroom. It would seem that the evidence as to the pistols would not be pertinent to the issues as to the guilt or innocence of the defendants on the Counts of the Indictment. The presence of the pistols would seem to be of pertinence in the hearing on the present motion only insofar as their presence in the residence combined with the warnings as to Bob Cruz given to the Narcotics Agents bears on the legality of their entry into the residence. That legality is, of course, a matter to be decided by this Court and not by the jury.

Section 7607, Title 26 U.S.C.A., provides, in part, as follows:

"The * * * agents * * * of the Bureau of Narcotics of the Department of the Treasury * * * may—

(1) carry firearms * * * and

(2) make arrests without warrant for violations of any law of the United States relating to narcotic drugs (as defined in section 4731)

or marihuana (as defined in section 4761) where the violation is committed in the presence of the person making the arrest or where such person has reasonable grounds to believe that the person to be arrested has committed or is committing such violation."

■ Section 3109, Title 18 U.S.C.A., provides, in part, as follows:

"The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance * * *."

That Section relates to the execution of a search warrant. It seems clear that the validity of the entry to execute the arrest without a warrant must be tested by criteria identical with those embodied in 18 U.S.C.A. § 3109. See Miller v. United States (1958), 357 U.S. 301, 309, 78 S.Ct. 1190, 2 L.Ed.2d 1332. That Section will be referred to as stating the rule to be observed by officers in making entrance into a house to execute an arrest. The rule referred to requires, in part, that officers about to enter a house for the purpose of making an arrest should make known to the occupant or occupants of the house their identity and the purpose for which they seek entry. Miller v. United States, supra.

In the present case the officers, after banging loudly on the front door, announced their identity and the purpose for which entry was sought. Therefore, the part of the rule above referred to was complied with.

The defendants' claim is that the officers failed to comply with the other part of the rule in that they broke open the screen door before the defendants had an adequate opportunity to refuse them admission and hence they used excessive force in making their entry.

The United States Supreme Court has not expressly passed on the question as to the legality or illegality of an entry where excessive force was allegedly used

in making it. There is one case in this Circuit in which that issue was raised. Barrientes v. United States (5th Cir. 1956), 235 F.2d 116, certiorari denied (1956), 352 U.S. 879, 77 S.Ct. 102, 1 L.Ed.2d 80. That case involved an appeal by the defendant from a conviction on a narcotics charge. In that case narcotics had been seized under a search warrant for the search of a residence. The defendant asserted two grounds or claims for reversal. The Court stated (p. 116):

"The ground of the first claim is that the officers who seized the narcotics under a search warrant did not serve it in accordance with, but in violation of, Section 3109, Title 18 U.S.C., in that, though they were not refused admittance, they nevertheless broke in the door and entered by force * *."

The Court further stated (p. 117):

"Of the first ground, it suffices, we think, to say that: the section invoked by defendant does not provide, the cases cited by defendant do not hold, and we have found none holding, that the use of excessive force in serving a search warrant, such as is claimed was used in this case, will invalidate a search and seizure made under it; and that, while the use of excessive, that is unnecessary, force is in any case to be deprecated, evidence obtained under a valid warrant is not thereby made inadmissible."

That case was heard by a panel composed of Judges Hutcheson, Rives and Brown. A per curiam opinion affirming the conviction was written by Judge Hutcheson. Judge Rives concurred specially. He stated that it was his view that the question of the use of excessive force was not reached because there was no showing that excessive force was used. Judge Brown concurred in the result. He concurred in the view of Judge Rives that there was no showing that any excessive force was used. In view of the somewhat uncertain state of the holding in that case, it cannot be said that it is settled in this Circuit that the use of excessive force in making entry into a residence in connection with an arrest and ensuing search does not invalidate the search. Neither can it be said that the United States Supreme Court would so hold. In the case of United States v. Whiting (4th Cir. 1962), 311 F.2d 191, in a footnote on page 195, reference is made to holdings that unnecessary violence does not invalidate a search under a proper search warrant.

There are two features of importance in connection with entry of officers into a residence for the purpose of making an arrest. The first is the making of an announcement of the identity of the persons seeking entry and the purpose of their proposed entry. If persons proceed to enter or attempt to enter a residence without informing the occupant or occupants who they are and why they seek admittance, the occupant or occupants might be fearsome that those attempting to enter were criminal intruders and might by means of arms or other means seek to prevent their entry. This would seem to be especially true where entrance is sought to be made late at night or in the early hours of the morning. In the present case the door to the residence was broken into at an early morning hour. If the officers had not made known who they were, the occupants of the residence might have made use of the weapons in the residence to shoot those attempting to enter and would have defended their action on the ground that they thought those attempting to enter were criminal intruders. In the present case the occupants of the residence were informed that the persons attempting entrance were law enforcement officers and that they sought entry for law enforcement purposes.

There is also another feature. The occupants of a residence about to be entered by law enforcement officers should ordinarily be given a reasonable opportunity to refuse admittance before having the door to the residence damaged by forcible entry.

In the present case the officers in question waited around 15 seconds following their announcement before forcing the door open. The defendants con-

tend that 15 seconds did not afford them a reasonable opportunity to open the door for the officers or refuse admittance and hence it could not be said that the officers were refused admittance and their forcing of the door under those circumstances constituted the excessive use of force in connection with their entry and hence made their entry illegal.

In the case of Miller v. United States, supra, the Court found that the officers who were in civilian dress had not adequately informed the defendant of their authority and purpose for making entry. The Court, in discussing the matter of noncompliance with the rule of the occupant of a residence being given an opportunity to refuse admittance, stated (357 U.S. p. 309, 78 S.Ct. p. 1195):

> " * * * There are some state decisions holding that justification for noncompliance exists in exigent circumstances, as, for example, when the officers may in good faith believe that they or someone within are in peril of bodily harm * * * or that the person to be arrested is fleeing or attempting to destroy evidence. * * "

The Court did not say whether it did or did not recognize such exceptions.

In the case of Ker v. State of California (1963), 374 U.S. 23, page 40, 83 S.Ct. 1623, 10 L.Ed.2d 726, it was stated that the Court had never rejected the doctrine that noncompliance may be reasonable in exigent circumstances. There is no fixed rule as to the time an officer must wait after announcing his authority and purpose before using force to break into a residence. It would seem to depend upon the particular circumstances in each case and the apparent exigencies of the situation. The courts have upheld rather brief intervals between the announcement of authority and purpose and the breaking in. Martin v. United States (5th Cir. 1965), 341 F.2d 576; McClure v. United States (9th Cir. 1964), 332 F.2d 19, 22; Masiello v. United States (1963), 115 U.S.App.D.C. 57, 317 F.2d 121, 122. Some of those intervals will next be noted. Martin v. United States, supra (about one minute); McClure v. United States, supra (4 or 5 seconds); United States v. West (2d Cir. 1964), 328 F.2d 16 (30 seconds); United States v. Whiting (4th Cir. 1962), 311 F.2d 191 (about one minute); United States v. Poppitt (D.C.1964), 227 F.Supp. 73 (12 or 15 seconds); United States v. Gorman (D.C.1962), 208 F.Supp. 747 (25 or 30 seconds).

In the present case the officers in connection with the arrests sought to secure the fruits of the crime of selling heroin. They also, because of that sale, had reasonable grounds for believing that the fruits of other crimes relating to narcotic drugs, i. e., the illegal importation and illegal possession of them, would be in the residence. It so happened that no heroin was found. Whether all the supply of heroin delivered earlier that morning had been sold or whether it had been successfully hidden or disposed of is a matter of speculation only. As heretofore noted, marijuana was found in the residence which was either the fruit of illegal importation or of illegal possession. Illegally possessed narcotics are also contraband.

In the present case it would appear that the elapse of 15 seconds without the door being opened by them could hardly be said to constitute a refusal on the part of the defendants to admit the arresting officers. The question then is whether the exigencies of the situation were such as to justify the officers in not waiting longer before forcing in the door.

In the present case following the announcement of their authority and purpose, the officers heard a rustling and scuffling sound. They also heard a bang. Those could have been indicative of an attempt by the occupants of the residence to dispose of the $210.00 in currency and the illegally possessed narcotics. However, whether such sounds were or were not indicative of such attempts, there was the probability that unless the arresting officers moved fast following the announcement of their authority and purpose the items referred to could have been quickly disposed of.

There is another feature in this case which was even of greater importance in connection with the matter of quick entry following the announcement of authority and purpose by the officers. Agent Arpaio, who made the forcible entry, as previously noted, had been informed by several members of the San Antonio Police Department that Bob Cruz was a dangerous man who always had a deadly weapon available in his residence. It appears that there was apprehension on the part of the officers that they might encounter what was termed a "shoot-out" and they wanted to move quickly following the announcement of their authority and purpose to prevent such an occurrence. They wanted to move quickly so as to get hold of any gun that Bob Cruz might have around before he had an opportunity to make use of it.

■ It is the view of the Court that the exigencies of the situation in the present case were such that the officers were justified in not waiting longer than they did following the announcement of their authority and purpose before forcing in the door of the residence.

It is the holding of the Court that the officers in question made proper and lawful entry into the residence.

It is the further holding of the Court that the defendants were properly and lawfully arrested by the officers in question following their entry into the residence.

The entry of the officers having been proper and lawful and the defendants having been properly and lawfully arrested, there is for consideration what seizures and searches might properly and lawfully be made by the officers as incidental to those arrests.

■ It is well settled that as incidental to a lawful arrest the arresting officers have the right to seize visible instrumentalities of the crime, the fruits of the crime, and contraband. Marron v. United States (1927), 275 U.S. 192, 199, 48 S.Ct. 74, 72 L.Ed. 231. See, also, United States v. Rabinowitz (1950), 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653. In the case of visible objects search is not involved, only seizure.

■ In the present case the 12 marijuana capsules in the open cigarette package on the top of the dresser were visible at the time of the arrests. Such marijuana capsules were the fruit of illegal narcotics traffic and, being illegally possessed, were contraband.

It is the holding of the Court that the 12 marijuana cigarettes were properly and lawfully seized.

It was heretofore noted that the officers searched the top drawer of the dresser and seized the $210.00 in currency and that they also searched the dining room and seized 13 grams of marijuana in a Prince Albert tobacco can which was on top of a cabinet. The question then is whether those items were properly searched for and seized incidental to the arrests.

It is to be noted that those searches and seizures were made immediately following the arrests and contemporaneous with them. The leading case on search and seizure incidental to an arrest is the case of Harris v. United States (1947), 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399. In that case federal agents had warrants for the arrest of the defendant for violations of the Mail Fraud Statute and the National Stolen Property Act. The agents arrested the defendant in the living room of an apartment of which he was in exclusive possession. Without a search warrant they intensively searched all four rooms of the apartment for five hours looking for cancelled checks and any other means by which the crimes charged might have been committed. Beneath some clothes in a bedroom bureau drawer they discovered a sealed envelope marked "personal papers" of the defendant. The envelope was torn open and found to contain several draft cards which were the property of the United States and the possession of which was a federal offense. The defendant was charged with and convicted of several violations of federal laws relating to draft cards. The Supreme

Court upheld the search and seizure of the draft cards. The Court stated (p. 151 of 331 U.S., p. 1101 of 67 S.Ct.):

"The opinions of this Court have clearly recognized that the search incident to arrest may, under appropriate circumstances, extend beyond the person of the one arrested to include the premises under his immediate control. * * *"

In that case there was a vigorous dissenting opinion by Justice Frankfurter joined in by two of the other Justices. In that same case the Court pointed out that there was a distinction between a search for and seizure of purely evidentiary materials and a search for and seizure of items which were instrumentalities of the crime, fruits of the crime, and property the possession of which is a crime, i. e., contraband. In connection with the matter of a search for and seizure of items regarded as being evidentiary in character, see Hayden v. Warden, Maryland Penitentiary (4th Cir. 1966), 363 F.2d 647, certiorari granted (1966), 385 U.S. 926, 87 S.Ct. 290, 17 L.Ed.2d 210.

In cases decided by the United States Supreme Court since the decision in Harris v. United States, supra, a sizable minority of the Court have contended for the giving of a very restricted permissible scope of search incidental to arrest. In view of that situation, it cannot be said that the present members of the Court would give such a wide scope to search and seizure of a premises incidental to lawful arrest as was given in the majority opinion in the case of Harris v. United States, supra.

The case of Harris v. United States, supra, was followed by the case of United States v. Rabinowitz (1950), 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653. In that case a warrant for the arrest of the defendant on the charge of overprinting a postage stamp was executed in the defendant's place of business. That place was a one-room office open to the public. After arresting the defendant the arresting officers, over his protest, searched a desk, safe and file cabinets in the office. The search lasted about an hour and a half. The officers found a large number of overprinted stamps. The Court upheld the search. Three Justices dissented. One Justice did not participate. In the majority opinion, following a review of the previous decisions of the Court, it is stated (p. 61 of 339 U.S., p. 433 of 70 S.Ct.):

" * * * It became accepted that the premises where the arrest was made, which premises were under the control of the person arrested and where the crime was being committed, were subject to search without a search warrant. Such a search was not 'unreasonable.' * * *."

In his dissenting opinion Justice Frankfurter vigorously contended that the only search permissible incidental to an arrest was that which could be regarded as encompassed by the search of "the person". That term was defined by him to include those surroundings which might fairly be deemed to be an extension of his person. He further stated that such extension would include items to which he had such an immediate physical relation that they could be said to be in his immediate control.

However, the holding of the majority in the case of Harris v. United States, supra, is apparently still the law. It was cited and followed in the case of Ker v. State of California (1963), 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726. In that case it is stated (pp. 41–42 of 374 U.S., p. 1634 of 83 S.Ct.):

" * * * The practicability of obtaining a warrant is not the controlling factor when a search is sought to be justified as incident to arrest, United States v. Rabinowitz, supra; * * *."

In the later case of Preston v. United States (1964), 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777, the situation was as next set forth. The defendants were arrested on a vagrancy charge by state officers while sitting in a parked automobile. After the defendants had been arrested the car was taken to a garage where it was searched and a certain item seized which connected them to a bank robbery.

Upon the trial for bank robbery, those items were admitted into evidence. The Court held that such evidence was inadmissible because the search of the car without a search warrant was too remote in time and place to be properly regarded as having been made incidental to their arrest. See, also, James v. State of Louisiana (1965), 382 U.S. 36, 86 S.Ct. 151, 15 L.Ed.2d 30.

The most recent decision of the United States Supreme Court dealing with search incidental to a lawful arrest is the case Cooper v. State of California (Feb. 20, 1967), 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730. That case involved a state court conviction. In that case the defendant was arrested for vagrancy while driving a car. Following his arrest the car was impounded and placed in a garage. A week later the car was searched by the officers without a warrant. A small piece of a brown paper sack was found therein which was introduced into evidence at the trial of the defendant on a narcotics charge. The Supreme Court upheld the validity of the search. In connection with the claim of the defendant that the officers should have secured a search warrant for the search of the car, it is stated in the majority opinion in regard to that claim (p. 62 of 386 U.S., p. 791 of 87 S.Ct.):

> " * * * It is no answer to say that the police could have obtained a search warrant, for '[t]he relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable.' United States v. Rabinowitz, 339 U.S. 56, 66 [70 S.Ct. 430, 435, 94 L.Ed. 653]. * * * "

In the recent case of Brazzell v. United States (5th Cir. 1966), 363 F.2d 374, the United States Court of Appeals for this Circuit cited and followed the case of Harris v. United States, supra.

In the present case the $210.00 in currency was manifestly the fruit of the crime of an illegal sale of narcotics. See United States v. Dornblut, (2d Cir. 1958), 261 F.2d 949, 951, certiorari denied (1959), 360 U.S. 912, 79 S.Ct.

1298, 3 L.Ed.2d 1262. The fruit in the present case had been taken into the Cruz residence but a few minutes before. Narcotics therein would probably have been the fruits of illegal importation. They would also constitute illegally possessed items—contraband.

The search and seizure of the $210.00 in currency in the top drawer of the dresser was a reasonable search and seizure under both the cases of Harris v. United States, supra, and United States v. Rabinowitz, supra. It might well be regarded as being so in the immediate control of the defendants as to come within the scope of the rule contended for by Justice Frankfurter in his dissenting opinion heretofore referred to. Manifestly the search of the dining room would not come within such scope.

The search of the dining room would have to come within the scope of the case of Harris v. United States, supra. However, the search of the dining room was not such an extensive and long continued search as was made in that case. Further, in that case the evidence which was the subject of search and seizure had to do with a crime wholly unrelated to the crime for which the arrest was made. In the present case the 13 grams of marijuana were integrally related to and connected with the crime for which the defendants were arrested. The situation was that the officers in the present case found the fruits of the illegal sale of narcotics and illegally possessed narcotics in one room. It would seem only natural and reasonable that they would look around the dining room and other rooms for other illegally possessed drugs. It is the view of this Court that their so doing did not constitute an unreasonable search under the circumstances.

It is the holding of the Court that the $210.00 in currency was properly and lawfully searched for and seized.

It is the further holding of the Court that the 13 grams of marijuana on the top of the cabinet in the dining room were properly searched for and seized.

It is hereby ordered that the motion of the defendants to suppress in all respects be and the same is hereby overruled and denied.

The foregoing constitute the Findings of Fact and Conclusions of Law as to the said motion.