**UNITED STATES of America**
v.
**Robert VIGO and Carmen Pagan, Defendants.**
**No. 72 CR. 897.**

United States District Court,
S. D. New York.
Dec. 19, 1972.

Whitney North Seymour, Jr., U. S. Atty. by Lawrence S. Feld, Asst. U. S. Atty., New York City, for plaintiff.

Lawrence Dubin, Russo & Dubin, New York City, for defendants.

*Memorandum Opinion on Motion To Suppress*

MOTLEY, District Judge.

Defendants Robert Vigo and Carmen Pagan were indicted on August 11, 1972 and charged with possessing, with intent to distribute, heroin in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A) and 18 U.S.C. § 2. They have moved to suppress tangible evidence obtained during the search of an automobile in which defendants were riding when arrested and from the search of defendant Pagan's pocketbook and certain oral statements allegedly made by both defendants subsequent to their arrest.

The court held a hearing on their motions on November 20 and November 21, 1972. At the end of the Government's case, the court ruled from the bench that the search of defendant Vigo's automobile, which revealed a quantity of heroin, was proper and that the evidence was admissible.

Defendant Pagan then took the stand and testified. With respect to the oral statements allegedly made by both defendants and the tangible evidence discovered during a search of defendant Pagan's purse, the court directed that the parties submit briefs and indicated that, despite any rulings from the bench, the suppression motions would be decided based on all the evidence adduced at the hearing.

Defendants' motions to suppress the oral statements and the evidence discovered during the search of Miss Pagan's pocketbook are granted for the reasons set forth below. Their motion with respect to the evidence seized from the automobile is denied.

On April 11, 1972, Thomas Smith, a special agent with the Federal Bureau of Narcotics and Dangerous Drugs, received information from an unidentified informant that defendant Vigo had offered to sell him up to one kilogram of cocaine. Agent Smith had known the informant since January, 1972. The informant was registered with the Bureau as a "cooperating informant" and had provided the Bureau with other information with respect to narcotics trafficking which had resulted in an arrest. The informant told Smith that he was to meet with Vigo the following day at Amigo's Bar, located at 8th Street and Avenue D in Manhattan. Smith instructed the informant to contact Vigo again and attempt to arrange the delivery of the cocaine for the following day.

On April 12, the informant told Smith that he had contacted Vigo and that Vigo had agreed to deliver the cocaine to him later that day. No price for the cocaine had been set. It was decided that the informant would call the agents by telephone in the presence of Vigo, inform Vigo that he was speaking with customers for the cocaine and arrange a meeting place where the agents would deliver the money. The informant ad-

vised Smith that Vigo would be driving to the bar in a 1965 Lincoln Continental with New York license plates. He also gave Smith a description of Vigo.

On the evening of April 12, agents established surveillance of Amigo's Bar. Special Agent Kieran Kobell, a member of the surveillance team, testified that the members of the team observed Vigo drive the automobile previously described by the informant to the bar and enter the bar at approximately 9:00 P. M.

At 9:45 P.M., Smith received a telephone call from the informant who advised him that he was calling from Amigo's Bar, that he had met with Vigo and an unidentified customer of Vigo's. The informant told the agent that Vigo was having a problem with the customer regarding some heroin with which the customer was dissatisfied. The agent was informed that Vigo had said that he could not do anything for the informant until he (Vigo) had satisfied the other customer. The informant asked Smith whether he would be interested in the heroin or whether he should pursue the cocaine.

Smith heard a man in the background say, "I paid $8,000. Tell him he can have it for that." The informant told the agent that the man he had heard was the customer for the heroin, that the customer had said that the package was "not good but he will let you have it for . . . the price he paid for it, just to get his money back."

Smith told the informant that the agents would not purchase the heroin package and that the informant should continue to negotiate for the cocaine and discover what Vigo intended to do with the heroin.

At 11:00 P.M., the informant again telephoned Agent Smith and told him that Vigo intended to take the package of heroin back to his supplier and would be leaving Amigo's Bar shortly. The informant told Smith that he [the informant] understood from his conversation with Vigo that the heroin had been placed in the trunk of Vigo's automobile.

Smith and another agent then left Smith's office to join the surveillance team. Special Agent Kobell testified that he observed Vigo leave the bar with two unidentified men at 11:45 P.M. Vigo and his companions then drove to East 5th Street and Avenue D. Vigo entered a housing project and returned to his car with Miss Pagan. The agents then followed the car to the Bronx where Vigo and his companions stopped at several bars. Once it appeared to the agents that Vigo was not going to any particular destination, they stopped the car in the vicinity of 163rd Street and Third Avenue in the Bronx at approximately 1:00 A.M. on April 13. All the occupants were removed from the car and told they were being arrested and, according to Smith's testimony, were advised of the offense for which they were being arrested. Defendant Pagan was advised that they were being arrested for "narcotics activities." The agents frisked Vigo and allegedly discovered a loaded .32 caliber revolver on his person. They subsequently searched the car and discovered in the trunk a black leather briefcase which contained several packages of what was believed to be heroin and narcotics paraphernalia, including spoons, rubber bands, a strainer and a scale. Approximately six agents were present at the time of the arrests and searches.

After Vigo was frisked, the agents seized Miss Pagan's purse and discovered, among other things, some notes thought by the agents to include a formula for cutting narcotics, a scale, and some marijuana.

Agent Smith testified that after the search of the car, he advised Vigo that ". . . he had a right to have an attorney, had a right not to say anything at all, that he had a right to have an attorney present during anything we might discuss, if he wanted to discuss anything, and advised him he had the right to have a court appointed attorney

if he so desired and could not afford his own attorney." Smith could not recall informing Vigo that anything he said could be used against him in court. After he was asked whether he understood what he had been told, Vigo purportedly expressed a willingness to talk and admitted that one of the packages contained heroin and that it belonged to him. According to Smith's testimony, Vigo said that Miss Pagan had knowledge of the heroin but he did not want her to have any responsibility for it.

When Miss Pagan was removed from Vigo's car she was crying. She was handcuffed and taken to another vehicle where she was verbally advised of her constitutional rights by Agent Kobell. She testified that she was too upset to understand what the agent told her. Agent Kobell testified that he advised Miss Pagan that ". . . she had the right to remain silent and that anything that she did say could be used against her, she had the right to counsel, and if she didn't have the funds for counsel, counsel would be appointed by the court and if she did decide to make a statement that she could refuse to answer any question at any time." She was not asked by Kobell whether she understood the warnings. She told Smith, some time later according to his testimony, that ". . . she had known that Vigo was involved in narcotics, that he [Vigo] had told her that he had a package in the car and that her only involvement was that she was living with Vigo and that she expected to receive some monetary value from the sale."

While she testified that she was too upset to understand the warnings given her by Agent Kobell, she was able to recall where she was arrested, and to describe Vigo's car and the car of one of the agents to which she was removed after being arrested. She also remembered being taken to a building in lower Manhattan and being photographed and fingerprinted.

I. Defendant Vigo's arrest was legal because the agents had probable cause to believe that Vigo had committed the offense for which he was arrested.

Since the agents relied in part on information provided by an unidentified informant, the court must determine whether there was a " 'substantial basis' for crediting the hearsay." United States v. Harris, 403 U.S. 573, 581, 91 S.Ct. 2075, 2080, 29 L.Ed.2d 723 (1971) (plurality opinion). Under *Harris* and Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) there must be established: 1) some of the underlying circumstances from which the informant concluded that the defendant was engaged in illegal activity and 2) some of the underlying circumstances from which the arresting officer concluded that the informant was credible or his information reliable.

The first requirement was satisfied by Agent Smith's testimony that the informant told him that Vigo had said that he would sell the informant cocaine and that he possessed a substantial quantity of heroin. "The requirement of Aguilar, that the basis of the informant's belief be shown, is met here by the informant's statement that his information was based upon defendant's own admission." United States v. Sultan, 463 F.2d 1066 (2d Cir. 1972).

The second requirement was also satisfied. Agent Smith testified that the informant had previously provided reliable information with respect to narcotics trafficking. This alone would be sufficient to justify reliance on the informant's story. *See, e.g.,* United States v. Perry, 380 F.2d 356 (2d Cir.), cert. denied, 389 U.S. 943, 88 S.Ct. 307, 19 L.Ed.2d 299 (1967). However, in the instant case, the informant's story was also corroborated by other facts that became known to the arresting officers. Agent Smith, when speaking with his informant by telephone on the evening of April 12, overheard a man saying that he paid "$8,000 . . . [and that] he can have it for that." This tended to corroborate the informant's allegation that there had been a discussion at Ami-

go's Bar about some unsatisfactory heroin. Moreover, the surveillance team stationed outside Amigo's Bar observed Vigo arrive in a car matching the description given by the informant and depart from the bar at about 11:45 P.M. The departure time corroborated the informant's tip that Vigo would be leaving shortly after 11:00 P.M. that evening.

There can be no question but that the informant's information, if believed, gave the agents probable cause to believe that defendant Vigo was trafficking in heroin and cocaine.

II. The search of the trunk of Vigo's car was lawful and evidence discovered pursuant to that search is admissible.

■ Since the informant told Agent Smith that Vigo intended to take the heroin package "back," presumably to his supplier, and that he understood from his conversation with Vigo that the heroin was located in the trunk of Vigo's car, the agents had probable cause to believe that the car was carrying contraband within the meaning of the forfeiture statute, 49 U.S.C. § 781(b)(1). Therefore, the car was subject to seizure and forfeiture under § 782. The Second Circuit has held that a vehicle subject to forfeiture can be searched without a warrant even in the absence of exigent circumstances making the obtaining of a warrant unfeasible. United States v. Francolino, 367 F.2d 1013, 1021 (2d Cir.), cert. denied, 386 U.S. 960, 87 S.Ct. 1020, 18 L.Ed.2d 110 (1967).

Alternatively, the search of the trunk can be upheld under the "automobile exception," permitting warrantless searches of movable vehicles where the police have probable cause to believe that the vehicle contains seizable items. *See* Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). The Second Circuit has indicated that a case-by-case determination of exigent circumstances is unnecessary in such cases. Raffone v. Adams, 468 F.2d 860, (2d Cir. 1972) ("Having held that there was probable cause for the arrest of

Raffone, we hold that the same probable cause justified the warrantless search of the truck Raffone was driving immediately prior to his arrest.") (alternate holding).

III. The arrest of defendant Pagan was unlawful and the evidence discovered pursuant to the search of her purse is inadmissible.

■ While the agents had probable cause to believe that defendant Vigo was committing violations of the federal narcotics laws and that contraband was located in his car, they had no probable cause to believe that defendant Pagan was involved in that criminal activity. Therefore, her arrest was unlawful and the search of her purse cannot be upheld as being incident to her arrest.

■ Nor can the search be upheld as incident to the valid arrest of defendant Vigo. The government contends that the defendant Pagan was part of the area from within which Vigo might obtain. a weapon or destroy evidence. However, there was no evidence that defendant Pagan was within the "reach" of Vigo. *See* Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Even if the "reach" test were extended to include areas immediately accessible to apparent confederates of the person being arrested, there was no reason to believe that Miss Pagan, a slightly built 22-year-old woman, had access to a weapon or evidence under the circumstances.

■ Finally, the search cannot be supported on the theory that it was a limited self-protective search for weapons permitted under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), for this was not a case where the agents were ". . . justified in believing that the individual . . . [was] armed and presently dangerous to the officer or to others. . . ." *Id.* at 24, 88 S.Ct. at 1881.

IV. The oral statements of both defendants allegedly made subsequent to their arrests are inadmissible under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct.

1602, 16 L.Ed.2d 694 and 18 U.S.C. § 3501.

 With respect to Vigo, Agent Smith could not remember at the hearing whether he warned him that anything he said could and would be used against him. This warning was held by the Miranda Court to be indispensable: "The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. This warning is needed in order to make him aware not only of the privilege, but also of the consequences of foregoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. More-over, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest." *Miranda, supra* at 469, 86 S.Ct. at 1625.

Given Agent Smith's inability to recall whether he gave this essential warning, the court cannot find that the government satisfied its "heavy burden . . . [of demonstrating] that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.* at 475, 86 S.Ct. at 1628.

Nor can the confession be admitted under the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C., § 3501. That statute provides that the trial judge shall determine whether a confession is voluntary. The statute provides in part:

. . . In determining the issue of voluntariness [the trial court] shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any auch statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

The presence or absence of any one of the above-mentioned factors . . . need not be conclusive on the issue of voluntariness of the confession.

 While the Miranda Court indicated that it was not creating a "constitutional straightjacket" which would handicap "sound efforts at reform," *Miranda, supra* at 467, 86 S.Ct. 1602, the Court declared that the *Miranda* safeguards would govern unless other procedures were developed which were ". . . at least as effective in apprising accused persons of their right of silence. . . ." *Id.* at 467, 86 S.Ct. at 1624. Given the importance the Supreme Court attached to the warning that anything said by a defendant would be used against him, this court will not assume that Congress intended to authorize the admission of confessions where this warning is not given, at least in the absence of strong evidence that the defendant was otherwise aware of the consequences of waiving his privilege. The court holds, therefore, that given the absence of counsel, the failure of the agent to warn defendant that his statement would be used against him and the absence of any evidence that defendant otherwise knew the consequences of a waiver of his privilege against self-incrimination,[1] the confession was not

---

1. The court assumes that the burden is on the government to show that the defendant knew that what he said could and would be used against him. *See*

"voluntary" within the meaning of § 3501.

■ Defendant Pagan's oral statement is also inadmissible under *Miranda* since there was no evidence that Miss Pagan was asked whether she understood her rights or that she waived those rights. The court cannot find a waiver on a silent record. As the *Miranda* Court stated, ". . . [A] valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained."[2] *Miranda, supra* at 475, 86 S. Ct. at 1628. There is no evidence in the record of any expression by Miss Pagan of a willingness to speak and a desire to waive counsel. Given the failure of the agents to determine whether she understood what she had been told it is difficult to infer that she intended to waive her rights when she spoke.[3] Presuming an intelligent waiver in this case is all the more difficult because of Miss Pagan's state of emotional upset at the time the warnings were given.[4]

■ Miss Pagan's statement is also inadmissible under 18 U.S.C. § 3501.

Bearing in mind that *Miranda* authorized Congress only to enact alternatives which would be at least as effective in warning defendants of their rights as the Miranda safeguards, the court finds that the statement was involuntary within the meaning of § 3501, given the absence of counsel, and defendant's youth, inexperience with the criminal process,[5] lack of formal education,[6] and emotional upset.

Because Miss Pagan's oral statement is inadmissible under Miranda and § 3501, the court need not decide whether her illegal arrest tainted her oral statement, making it inadmissible under Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Defendants' motion to suppress the tangible evidence discovered in the trunk of Vigo's automobile is accordingly denied, and defendant Pagan's motion to suppress the tangible evidence discovered in her purse and both defendants' motions to suppress their oral statements are granted.

Submit order.

---

Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) (Burden on the government to show by a preponderance of the evidence that confession is voluntary).
The fact that Vigo has a criminal record—he is now awaiting trial on a state charge—is hardly enough for the court to infer that he knew his rights.

2. Thus, "[a]n express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver." *Miranda, supra* at 475, 86 S.Ct. at 1628.

3. It may be that Miss Pagan was given adequate warnings of her rights and waived them later that morning in the

United States Attorney's office. However, the oral statement in question was made prior to her appearance in that office.

4. While the evidence of waiver was insufficient, the warnings were adequate. The failure of the agent to tell defendant specifically of her right to have counsel present *during any questioning* was not fatal. *See* United States v. Cusumano, 429 F.2d 378 (2d Cir.), cert. denied, 400 U.S. 830, 91 S.Ct. 61, 27 L.Ed.2d 61 (1970).

5. Miss Pagan testified that she had never been arrested prior to April 13, 1972.

6. Miss Pagan had dropped out of high school and was studying cosmetology at the time of her arrest.