**UNITED STATES of America, Appellant,**

v.

**Robert VIGO and Carmen Pagan, Defendants-Appellees.**

**No. 918, Docket 73–1133.**

United States Court of Appeals, Second Circuit.

Argued June 26, 1973.

Decided Sept. 11, 1973.

Timbers, Circuit Judge, filed opinion concurring in part and dissenting in part.

---

296

Lawrence S. Feld, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., and John W. Nields, Jr., Asst. U. S. Atty., on the brief), for appellant.

Russo Dubin & Goldberg, New York City, on the brief, for defendants-appellees.

Before LUMBARD, HAYS and TIMBERS, Circuit Judges.

LUMBARD, Circuit Judge:

The government appeals from an order of the Southern District, entered January 18, 1973, which suppressed certain evidence relating to the prosecution of Robert Vigo and Carmen Pagan, who were indicted on August 11, 1972, for possession of heroin with intent to distribute it, in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(A), and for conspiracy to violate these sections (18 U.S.C. § 2). Prior to trial defendants moved to suppress tangible evidence obtained during the search of the automobile in which they were riding at the time of their arrest, to suppress other tangible evidence obtained from defendant Pagan's pocketbook, and also to suppress oral statements made by both defendants shortly after their arrest. The district court, after a hearing, denied the motion with respect to the evidence seized from the automobile, but granted it with respect to the evidence seized from Miss Pagan's purse and with respect to the oral statements, see 357 F. Supp. 1360 (S.D.N.Y. 1972). The government does not challenge the suppression of Miss Pagan's statement, but pursuant to 18 U.S.C. § 3731, it has appealed the order to the extent that it sup-

pressed the evidence seized from Miss Pagan and Vigo's oral statement.

We reverse, and hold that both defendant Vigo's oral statement and the evidence seized from Miss Pagan are properly admissible.

From the evidence at the hearing, the district court found the following facts. On April 11, 1972, Thomas Smith, a special agent with the Federal Bureau of Narcotics and Dangerous Drugs (BNDD), received information from an unidentified informant [1] that Vigo had offered to sell him up to one kilogram of cocaine. The informant reported that he was to meet with Vigo the following day at Amigo's Bar, located at 8th Street and Avenue D in Manhattan. Smith instructed the informant to contact Vigo again and attempt to arrange for the delivery of the cocaine to take place at that meeting.

On April 12, 1972, the informant told Smith that he had contacted Vigo and that Vigo had agreed to deliver the cocaine to him later that day for an undetermined price. Smith and the informant decided that the latter would telephone Smith or other BNDD agents when he was with Vigo, that he would inform Vigo he was calling his customers for the cocaine, and that he would try to arrange a meeting place where completion of the transaction could take place. The informant advised Smith that Vigo would be driving to Amigo's Bar in a 1965 Lincoln Continental with New York license plates. He also gave Smith a description of Vigo.

On the evening of April 12th, BNDD agents (not including Agent Smith) established surveillance of Amigo's Bar. Members of the surveillance team observed Vigo drive up to the bar in the automobile described by the informant, and they watched Vigo enter the bar at

about 9:00 p.m. At 9:45 p.m. Smith received a telephone call at his office from the informant, who advised him that he was calling from the bar and that he was with Vigo and an unidentified customer of Vigo's. The informant reported that Vigo was having difficulty with the customer regarding some heroin with which the customer was dissatisfied, and that Vigo was unwilling to conduct further business until the other customer was satisfied. The informant asked Smith whether he would be interested in the heroin which the other customer was desirous of returning, or whether the purchase of the cocaine, as originally contemplated, should be pursued. Smith then heard a man in the background say, "I paid $8000. Tell him he can have it for that." The informant stated that the voice was that of Vigo's customer and that the customer had just said the package of heroin was "not good" but he would (in the informant's words) "let you have it for the price he paid for it, just to get his money back." Smith told the informant that the agents would not purchase the heroin package, that he should continue to negotiate for the cocaine, and that he should attempt to discover what Vigo intended to do with the heroin.

At 11:00 p.m. the informant again telephoned Agent Smith and told him that Vigo intended to take the package of heroin back to his supplier and that he would be leaving Amigo's Bar shortly. He also said that he believed the heroin was located in the trunk of Vigo's car. Informed of this, Smith and another agent left his office and joined the surveillance team. Vigo was observed to leave the bar at 11:45 p.m., accompanied by two unidentified men. The members of the surveillance team followed Vigo and his companions to

1. The record reveals that Agent Smith had known the informant since January, 1972. The informant was registered with the Bureau of Narcotics and Dangerous Drugs as a cooperating informant. He had previously provided the Bureau with information in another case which had resulted in the seizure of a kilogram of heroin and a half kilogram of cocaine and the arrest of one suspect. He had also supplied information concerning other narcotics traffickers which had resulted in the arrest of one other suspect.

East 5th Street and Avenue D in Manhattan, where Vigo entered a housing project and returned with Miss Pagan.

The agents subsequently followed the car to the Bronx, where Vigo and his companions stopped at several bars. It shortly became apparent that Vigo was not going to any particular destination, and consequently, at roughly 1:00 a.m. on the morning of the 13th, the agents stopped Vigo's car in the vicinity of 163rd Street and Third Avenue. All four occupants were removed from the car, were told that they were being arrested, and were advised of the offense for which they were being arrested.

Six agents participated in the arrest, and as a result the events described below happened nearly simultaneously.[2] The agents frisked Vigo and found a loaded .32 caliber revolver tucked in his belt. They then took Miss Pagan's purse (they did not search her person) and searched it, discovering, among other things, some notes thought by the agents to contain a formula for cutting narcotics, a scale, and some marihuana. They also searched Vigo's car, and in the trunk Agent Smith discovered a briefcase containing several packages of heroin as well as narcotics paraphernalia, including spoons, rubber bands, a strainer, and a scale.

After the search of the car, Agent Smith advised Vigo that " . . . he had a right to have an attorney, had a right not to say anything at all, that he had a right to have an attorney present during anything we might discuss, if he wanted to discuss anything, and advised him he had the right to have a court-appointed attorney if he so desired and could not afford his own attorney." Smith could not recall that he had informed Vigo that anything he said could later be used against him. Vigo was asked whether he understood what he had been told, and in response Vigo expressed a willingness to talk. He admitted that one of the packages contained heroin and that it belonged to him. Furthermore, in what appears to have been an effort to protect his companions, he stated that although Miss Pagan knew there was heroin in the car, she was not responsible for it, and that the other two occupants of the car did not even have knowledge of it.

■ We hold that the search of Miss Pagan's purse was reasonable and proper as a normal protective measure on the part of law enforcement authorities. A loaded concealed gun had just been found on her companion Vigo. A lady's handbag is the most likely place for a woman similarly to conceal a weapon. *Cf.* United States v. Berryhill, 445 F.2d 1189 (9th Cir. 1971). The search of the handbag took place directly after the defendants had been stopped. The circumstances fall well within the limits of permissible protective search established in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Cf.* United States v. Johnson, 467 F.2d 630 (2d Cir. 1972). Nor did the search spill over into an unrelated and therefore unreasonable search for evidence. The agents did not search Miss Pagan's person. They did no more than ascertain the contents of the place where she would have been most likely to hide a weapon. Evidence of crime discovered by virtue of such a limited investigation is not the fruit of an unreasonable search and is admissible. See United States v. Del Toro, 464 F.2d 520 (2d Cir. 1972).

■ Defendant Vigo's oral admissions made at the time of his arrest are also admissible. In Miranda v. Arizona, 384 U.S. 436, at 478, 86 S.Ct. 1602, at

<hr>

2. Neither the transcript of the suppression hearing nor the district court's Memorandum Opinion on the motion to suppress indicates the exact sequence of events immediately following the arrest. But it is clear that all the events occurred within a very short span of time after the automobile was stopped.

1630, 16 L.Ed.2d 694 (1966), the Supreme Court stated:

> In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege [against self-incrimination] while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime [footnote omitted], or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

Vigo's statements were voluntary within the meaning of this language, and their admission into evidence did not violate the Fifth Amendment privilege against self-incrimination. Nor does it contravene the purpose behind *Miranda* of curtailing illegal custodial interrogation by law enforcement authorities. The statements were made immediately after Vigo's arrest, at the scene of the arrest and before any systematic inquiry was begun by the arresting agents. None of the inherently compelling factors of station-house interrogation were present. The arresting agents did not coerce or deceive him. He was aware of the illegality of his acts,[3] and had in addition been given three of the four warnings required by *Miranda*. He spoke in an effort to protect his companions, particularly Miss Pagan, and with evident knowledge of the meaning and consequences of what he said. Under these circumstances, the admissibility of his statements was not precluded either by the Fifth Amendment or by *Miranda*. Stone v. United States, 385 F.2d 713 (10th Cir. 1967), cert. den., 391 U.S. 966, 88 S.Ct. 2038, 20 L.Ed.2d 880 (1968); Pitman v. United States, 380 F.2d 368 (9th Cir. 1967); Parson v. United States, 387 F.2d 944 (10th Cir. 1968); Sablowski v. United States, 403 F.2d 347 (10th Cir. 1968); United States v. Tafoya, 459 F.2d 424 (10th Cir. 1972); United States v. Cruz, 265 F.Supp. 15 (W.D. Tex., 1967); People v. Gant, 264 Cal.App.2d 420, 70 Cal.Rptr. 801 (1968); Cameron v. State, 214 So. 2d 370 (Fla.D.C.App. 1968). See also People v. Dorado, 62 Cal.2d 338, 354, 42 Cal.Rptr. 169, 179, 398 P.2d 361, 371 (1965).

Inasmuch as we hold defendant Vigo's statements voluntary and admissible under the requirements of Miranda v. Arizona, *supra*, they are similarly voluntary and admissible under the requirements of 18 U.S.C. § 3501. It is therefore unnecessary to reach the question of the application and constitutionality of § 3501.

The order of the district court suppressing the evidence seized from defendant Pagan's purse and suppressing the oral statements of defendant Vigo is accordingly reversed.

TIMBERS, Circuit Judge (concurring in part and dissenting in part):

I concur in the judgment of the Court and in the majority opinion to the extent that they reverse that part of the order of the district court which suppressed the evidence seized from defendant Pagan's purse.

With deference, however, I respectfully dissent from the reversal of that part of the order of the district court which suppressed the oral statements of defendant Vigo.

The majority holds that Vigo's inculpatory statements are admissible. In

---

3. Agent Smith testified that among Vigo's first words after being taken out of the car were, "I know what you got me for."

holding these statements to have been "voluntary" and therefore admissible without the necessity of finding an "intelligent waiver", the majority, it seems to me, has unjustifiably ignored the rationale and holding of Miranda v. Arizona, 384 U.S. 436 (1966). The instant case is strikingly different from those which have admitted voluntary exclamations. To hold Vigo's inculpatory statements to have been "voluntary" so that Miranda warnings need not have been given, in effect is to return to the pre-Miranda test of voluntariness and to validate, sub silentio, Title II of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 3501 (1970).

In Miranda, the Supreme Court held that persons in police custody are subject to a form of "compulsion inherent in custodial surroundings". 384 U.S. at 458. In order to protect the individual against this inherent compulsion, and to safeguard his right "to remain silent unless he chooses to speak in the unfettered exercise of his own will", id. at 460, the Court held that individuals in custody must be made aware of their "right of silence", id. at 444, and must be given warnings prior to custodial interrogation. One of the required warnings—not given to Vigo—is that the person to be questioned be told that anything said "can and will be used against the individual in court". Id. at 469. The Supreme Court emphasized the importance of this specific warning:

> "This warning is needed in order to make him aware not only of the privilege [against self-incrimination], but also of the consequences of foregoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons

acting solely in his interest." 384 U.S. at 469.

True, as the majority in the instant case correctly recognizes, a determination under Miranda of whether an individual "knowingly and intelligently waived his privilege against self-incrimination", 384 U.S. at 475, is not a precondition to the admission of an inculpatory statement if it can be initially shown that the Miranda warnings need not have been given. The types of cases envisaged by the Supreme Court as not requiring Miranda warnings are those involving an absence of questioning which result in "volunteered statements", such as where an individual "enters a police station and states that he wishes to confess to a crime". Id. at 478. Thus, in United States v. Tafoya, 459 F.2d 424 (10 Cir. 1972), although the Miranda warnings were not given and there was no intelligent waiver, an inculpatory statement was properly admitted since it was "obviously not the product of interrogation but was simply a spontaneous utterance volunteered by the defendant". 459 F.2d at 427. Similarly, other cases have recognized that incriminatory statements were admissible without the necessity of finding a Miranda waiver where it was found that such admissions were "spontaneous", were made "before any questions had been asked", were "entirely voluntary", Pitman v. United States, 380 F.2d 368, 370 (9 Cir. 1967), and, "if the arresting officer has not attempted or is not attempting to have the arrested person incriminate himself". United States v. Cruz, 265 F.Supp. 15, 20 (W.D.Tex.1967). See Parson v. United States, 387 F.2d 944 (10 Cir. 1968).

Here, it cannot be said that Vigo's statements to Special Agent Smith, made after Vigo was placed in custody, were spontaneous or were made before questioning began. Vigo's inculpatory statements were made during a discussion in response to questions by Smith which sought to elicit such admissions.[1]

---

1. Agent Smith testified that, after advising Vigo of some of his constitutional rights, he and Vigo "discussed the package that he had. . . .i. e. [and] also discussed wheth-

The *Miranda* requirements therefore are applicable. As the district court found, 357 F.Supp. at 1366, since Vigo was not warned that anything he said could and would be used against him, the government has not satisfied its "heavy burden . . . [of demonstrating] that the defendant knowingly and intelligently waived his privilege against self-incrimination" (quoting from *Miranda*, 384 U.S. at 475).[2]

I think the majority also has erred in holding that Vigo's statements were voluntary because "[n]one of the inherently compelling factors of station-house interrogation were [sic] present. The arresting agents did not coerce or deceive him". *Supra* at 299. It was precisely this type of determination of voluntariness, required by pre-*Miranda* law, which *Miranda* rejected but which was codified in 18 U.S.C. § 3501(b).[3] Furthermore, in holding that Vigo spoke "with evident knowledge of the meaning and consequences of what he said", *supra* at 299, the majority seems to me to have rejected the rationale of *Miranda* and to have embraced the "totality of the circumstances" analysis prescribed by Section 3501(b).[4] The validity of the majority's criticism of *Miranda* cannot be gainsaid. It has been as a result of occasional unduly harsh *Miranda* rulings that this Court previously has interpreted *Miranda* to avoid having "[t]he criminal . . . . go free because the constable has blundered." People v. Defore, 242 N.Y. 13, 21 (1926) (Cardozo, J.). See, e.g., United States v. Lamia, 429 F.2d 373 (2 Cir.), cert. denied, 400 U.S. 907 (1970). Dissatisfaction with a controlling Supreme Court decision, however, does not warrant judicial legislation. I am sure that my colleagues do not suggest it does. But their application of *Miranda* to the facts of the instant case strikes me as coming perilously close to frustrating the rationale of this controlling Supreme Court decision.

I would affirm the district court's suppression of the oral statements of defendant Vigo.

---

er or not any of the other people in the car had knowledge. . . . " Transcript of Suppression Hearing at 14. It is obvious from the testimony of Smith that "a lot of things were said", *id.* at 14–15, and that Vigo was being questioned in detail.

2. This is consistent with the government's position on this appeal. It seeks reversal of the suppression order not on the ground that *Miranda* has been improperly applied, but rather on the ground that Section 3501 and not *Miranda* should govern. See Brief of Appellant at 6.

3. Section 3501 provides that any confession is admissible if it is found to be "voluntarily given". 18 U.S.C. § 3501(a) (1970). The statute further provides that:

"(b) The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession."

4. The difficult questions of whether Section 3501 was intended to overrule *Miranda*, and whether it would be constitutional if it did, are not presently before us. Today's opinions are not addressed to those questions.