**STATE of Minnesota, Respondent,**

**v.**

**Andrea Lynn WYNNE, Appellant.**

**No. C2–94–2147.**

Supreme Court of Minnesota.

Aug. 8, 1996.

Hubert H. Humphrey, III, State Atty. General, St. Paul, Jeffrey Edblad, Cambridge, for Appellant.

John M. Stuart, Minnesota Public Defender, Scott G. Swanson, Assistant Public Defender, Minneapolis, for Respondent.

OPINION

TOMLJANOVICH, Justice.

On October 18, 1993, at about 3:30 p.m., a search warrant was executed at the home of appellant Andrea Wynne's mother, Joy Wynne, in Isanti, Minnesota. The warrant authorized the search of, among other things: the person of Joy Pamela Wynne or any other persons located at her residence at the time of the search, the cottage-type house in the process of being painted, the three or four out-buildings, the entire premises encompassed by the legal description of the property, the motor vehicle registered to Andrea Lynn Wynne and all other motor vehicles located on the premises. The property and things sought by the search included various controlled substances, measuring devices, and weapons capable of use in distributing or protecting controlled substances. The warrant did not specifically authorize the search of the person of Andrea Wynne.

After securing the premises, the officers proceeded with the search and seized, among other things: LSD, Darvon, two small bags of amphetamine, a silver pitcher containing amphetamine, marijuana from the kitchen windowsill, prescription Motrin found in the bathroom, and pill boxes, pipes, baggies and scales found under a bed.

At about 4:40 p.m., Andrea Wynne arrived home in a car driven by Micheal Klapak to discover the search in progress. As Wynne got out of the car, officers on the scene questioned her, learning that she was Joy Wynne's daughter and that she resided in the house being searched. The officers then took Wynne's purse and escorted her into the house. Once inside officers searched the purse without Wynne's consent. They discovered a white powdery substance which proved to be amphetamine, a small amount of marijuana, and drug paraphernalia including three marijuana pipes, razor blades, and snorting tubes. Wynne was then arrested.

Wynne was charged with felony possession of a controlled substance in the fifth degree in violation of Minn.Stat. § 152.025, subd. 2(1) (1992); possession of drug paraphernalia in violation of Minn.Stat. § 152.092 (1994); and possession of a small amount of marijua-

na in violation of Minn.Stat. § 152.027, subd. 4(a) (1994). Wynne filed a motion to dismiss the charges and a motion to suppress the evidence. The district court found the search valid as similar to a *Terry* search, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and denied both motions. The parties submitted the matter for trial on stipulated facts and the court determined that Andrea Wynne was guilty of all the charges.

Wynne appealed, and the court of appeals affirmed the conviction in an unpublished opinion. It held that the search of Wynne's purse did not exceed the scope of the warrant to search Joy Wynne's premises. We granted review and now reverse.

■ The court of appeals found that the search of Wynne's purse was justified as coming within the scope of the warrant. The court cited to *United States v. Ross*, 456 U.S. 798, 820–21, 102 S.Ct. 2157, 2170–71, 72 L.Ed.2d 572 (1982) to support its conclusion. In *Ross* the Supreme Court explained in dicta that any container within a residence that is the subject of a valid search warrant may be searched if it is reasonable to believe that the container could conceal items of the kind described in the warrant. *Id.*

*Ross*, however, involved the warrantless search of packages contained in the trunk of an automobile. *Id.* at 801, 102 S.Ct. at 2160. Further, Wynne's purse was not found in Joy Wynne's home but brought into the home by officers from an automobile that was driven onto the premises after the search was commenced. Thus, we find *Ross* inapplicable to the present situation.

The court of appeals also cited to *United States v. Micheli*, 487 F.2d 429 (1st Cir.1973) to support its conclusion. In *Micheli*, police obtained a search warrant for a business office. *Id.* at 430. During the search, police found a briefcase that belonged to a co-owner of the business tucked under a desk. *Id.* The police searched the briefcase and discovered counterfeit currency. *Id.* The issue in *Micheli* was whether the search of a "personal effect not currently worn, but apparently temporarily put down, such as a briefcase, falls outside the scope of a warrant to search the premises." *Id.* at 431. The First Circuit

held that as co-owner of the business premises searched, the owner of the briefcase:

> had a special relation to the place, which meant that it could reasonably be expected that some of his personal belongings would be there. Thus, the showing of probable cause and necessity which was required prior to the initial intrusion into his office reasonably comprehended within its scope those personal articles, such as his briefcase, which might be lying about the office.

*Id.* at 432. The court concluded that the search did not violate the Fourth Amendment. *Id.*

We, however, find *Micheli* distinguishable from the present circumstances. In this case, the purse was not "lying about" Joy Wynne's home. Rather, it was physically taken from Andrea Wynne. Further, *Micheli* itself states that "a search of clothing currently worn is plainly within the ambit of a personal search and outside the scope of a warrant to search the premises." *Id.* at 431. It has been held that, with respect to a police search, a shoulder purse is "so closely associated with the person that [it is] identified with and included within the concept of one's person." *United States v. Graham*, 638 F.2d 1111, 1114 (7th Cir.), *cert. denied*, 450 U.S. 1034, 101 S.Ct. 1748, 68 L.Ed.2d 231 (1981). Thus, we conclude that the search of Wynne's purse constituted a search of her person and did not fall within the ambit of the premises search warrant.

■ The state next argues that the search of Wynne's purse was valid under the warrant because the officers had probable cause at the time of the search to believe appellant had the objects described in the warrant on her person. In general, "[a] search warrant authorizing the search of a particular building or premises does not give the officers the right to search all persons who may be found in it." *State v. Fox*, 283 Minn. 176, 179, 168 N.W.2d 260, 262 (1969). However, the warrant in question in this case was a so called "all persons" warrant. That is, it allowed the search of "any other persons located at the residence at the time of the search."

A similar situation arose in *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). In *Ybarra*, police obtained a warrant authorizing the search of an Illinois tavern and the person of the bartender at the tavern for "'evidence of the offense of possession of a controlled substance.'" *Id.* at 88, 100 S.Ct. at 341. An Illinois state statute authorized "law enforcement officers to detain and search any person found on premises being searched pursuant to a search warrant, to protect themselves from attack or to prevent the disposal or concealment of anything described in the warrant." *Id.* at 87, 100 S.Ct. at 340. While executing the warrant, officers searched Ybarra, a patron in the bar, and found packets of heroin. *Id.* at 88–89, 100 S.Ct. at 340–41. The Supreme Court held the search unconstitutional stating:

> Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.

*Id.* at 91, 100 S.Ct. at 342.

This court addressed the constitutionality of an "all persons" warrant in *State v. Hinkel*, 365 N.W.2d 774 (Minn.1985). In *Hinkel*, an all person warrant was constitutionally permissible in the search of all persons on the premises of an "after hours joint," where liquor was sold after the legal closing hours of bars. We stated that in order to find such a warrant constitutional:

> There must be a sufficient nexus between the criminal activity, the place of the activity, and the persons in the place to show probable cause. This nexus has been described as * * * "whether the information supplied the magistrate supports the conclusion that it is probable anyone in the described place when the warrant is executed is involved in the criminal activity in such a way as to have evidence thereof on his person."

*Id.* at 776 (quoting 2 W. LaFave, *Search and Seizure* § 4.5, at 92 (1978)).

We conclude that a sufficient nexus does not exist in the current situation. By the terms of the search warrant, it was to be executed only during daytime hours. During the day, relatives, guests or hired workpeople could have been present on the residential premises to be searched. Indeed, on the day of the search a house painter was apparently at Joy Wynne's home. A review of the record revealed no information presented to the magistrate which would give rise to probable cause that any person who might be present during execution of the warrant would be "involved in the criminal activity in such a way as to have evidence thereof on his person." LaFave, *supra*, § 4.5 at 92. We therefore conclude that the portion of the warrant allowing the search of "any other persons located at the residence at the time of the search" to be unconstitutional. Thus, the search of Andrea Wynne cannot be justified under this section of the warrant.

■ The state next argues that the search of Andrea Wynne's purse could be upheld under exceptions to the warrant requirement. It first argues that the search was valid as incident to a lawful arrest. An arresting officer may search the arrestee and the area within the immediate control of the arrestee in order to prevent destruction of evidence or to remove any weapons that the arrestee might use to resist arrest or effect escape. *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). A search may precede arrest so long as the results of the search that precedes arrest are not necessary to support probable cause to arrest. *Rawlings v. Kentucky*, 448 U.S. 98, 111, 100 S.Ct. 2556, 2564–65, 65 L.Ed.2d 633 (1980); *State v. White*, 489 N.W.2d 792, 795 n. 2 (Minn.1992).

■ The issue, then, is whether probable cause to arrest Andrea Wynne existed before she was arrested and independent of the items found in her purse. "The test of probable cause to arrest is whether the objective facts are such that under the circumstances 'a person of ordinary care and prudence [would] entertain an honest and strong suspicion' that a crime has been committed." *State v. Johnson*, 314 N.W.2d 229, 230 (1982)

(quoting *State v. Carlson*, 267 N.W.2d 170, 173 (Minn.1978)).

The state claims that probable cause to arrest Andrea Wynne rests on the fact that she was a "resident of a house where ongoing, open, and illicit drug activities were being conducted." The state cites to *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) to support its argument. In *Ker*, a suspect's wife was arrested when there was evidence of marijuana sales in plain view in the apartment of which she was in joint possession with her husband, the suspect, accompanied by information that he had been using their apartment as a base of operations for narcotics activities. *Id.* at 28–29, 83 S.Ct. at 1627–28.

We, however, find *Ker* distinguishable. In that case, the arrestee was the suspect's wife. In the present case, however, Andrea Wynne was Joy Wynne's 21–year–old daughter who apparently had little income of her own. In *Ker*, the arrestee's association with the suspect was certainly more voluntary than in the present situation. As the suspect's daughter, Andrea Wynne likely had little choice about living at home and there was no evidence that she had any control over her mother's activities. We conclude that Andrea Wynne's status as the daughter of Joy Wynne, living in the elder's home where drugs were found was not enough to form the basis for probable cause to arrest Andrea Wynne. Thus, we hold that the search of Andrea Wynne's purse cannot be justified as incident to a lawful arrest.

The State's final argument is that the search of Andrea Wynne's purse was valid as a protective search of an individual arriving during the execution of a search warrant.

We recognize that ordinarily a search warrant to search for contraband carries with it the limited authority to detain the occupants of the premises while the search is conducted. *Michigan v. Summers*, 452 U.S. 692, 705, 101 S.Ct. 2587, 2595–96, 69 L.Ed.2d 340 (1981). We have even upheld a protective frisk of a nonoccupant of a dwelling who arrived during the execution of a search warrant. *State v. Bitterman*, 304 Minn. 481, 232 N.W.2d 91 (1975). However, *Bitterman* pre-

sented a stronger case for a protective search than is present here. In that case, a drug search was in progress when Bitterman and a companion arrived. *Id.* at 483, 232 N.W.2d at 93. The officer recognized Bitterman who had been pointed out to him as a heavy user of heroin and the officer had evidence that the companion was a known heroin user. The officer had observed traffic to and from the residence and knew that dangerous people who commonly carried weapons were involved. *Id.* at 485, 232 N.W.2d at 94. The facts in the instant case are not so dramatic. Under the circumstances of this case we conclude that the search of Andrea Wynne's purse violated her constitutional rights.

When Andrea Wynne arrived at her home, officers met her at the car in which she arrived, determined that she was an occupant of the premises being searched, took her purse and walked her and separately her purse, into the house. First, we fail to understand how the purse remained a threat to officers when it had been taken away from its owner. Second, even if we accepted that the purse did remain a threat because Andrea Wynne could somehow have retrieved it from officers inside the house, it was a threat that the officers themselves created by bringing the purse inside the house. The officers then went about remedying the self-generated dangerous situation by invading Andrea Wynne's privacy. Had Andrea Wynne brought the purse with her into her home or had she asked officers to carry the purse in for her, our decision might be different. However, we see no reason why officers could not simply have left Andrea Wynne's purse in the car.

We understand that in the excitement, and oftentimes the danger of a drug search, the officers do not have time to reflect on the parameters of *Terry*. We, however, do have that luxury. We have a duty to the citizens and to law enforcement officers to analyze the law carefully and set out clearly the limits of a search. In our experience law enforcement officers are not anxious to exceed the law, and for that reason we need to carefully define the limits of a search warrant. We thus hold that, under the circum-

stances of this case, the search of Andrea Wynne's purse was unconstitutional and any evidence obtained from the search must be suppressed.

Reversed and remanded.

ANDERSON, Justice, dissenting.

I respectfully dissent. The police in this case engaged in a constitutionally permissible search, and the fruits of that search are admissible evidence. To hold otherwise misapplies United States Supreme Court precedent, and now makes it more difficult for law enforcement officers to ensure their safety and the safety of others in the risk-laden circumstances of a legal search for drugs.

The district court found that the search of Andrea Wynne's (Wynne) purse was similar to a *Terry*-type search and that the search was necessary to determine if Wynne was in possession of any weapons. The court concluded that this type of search is necessary to ensure the safety of police officers and is appropriate when officers are conducting drug searches.

The majority concedes that the search of Wynne's purse constituted a search of her person, but sees no reason why the officers could not simply have left Wynne's purse in the car. Alternatively, officers might have ordered Wynne herself to remain in the car, or even ordered her and her companion to leave the premises. However, the question before the court is not what the officers might have done, but rather whether what the officers *did* do was constitutionally permissible.

A search by police officers is permissible only if it does not breach certain constitutional protections. The Fourth Amendment to the United States Constitution and Article I of the Minnesota Constitution prohibit unreasonable searches and seizures by the government of "persons, houses, papers and effects." U.S. Const. amend. IV; Minn. Const. art. I, § 10. Warrantless searches are *per se* unreasonable unless they fall within a limited number of exceptions to the warrant requirement. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). However, as the majori-

ty acknowledges, police are justified in detaining a person during the execution of a search warrant when that person is present at the scene. *State v. Blacksten*, 507 N.W.2d 842, 847 (Minn.1993) (citing *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981)). Police may also conduct a protective frisk of persons present during execution of a search warrant. *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). An officer may frisk an individual for weapons when the officer can articulate suspicion that an individual he or she is investigating is armed and presently dangerous. *Terry v. Ohio*, 392 U.S. 1, 21–22, 24, 88 S.Ct. 1868, 1879–80, 1881–82, 20 L.Ed.2d 889 (1968) (upholding a protective frisk of an individual in circumstances which indicated criminal activity may be afoot).

The United States Supreme Court in *Terry* recognized that it is unreasonable to require that police officers take unnecessary risks in the performance of their duties. *Id.* at 23, 88 S.Ct. at 1881. However, "the 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked." *Ybarra*, 444 U.S. at 94, 100 S.Ct. at 343. Both *Terry* and *Ybarra* require that a search of a person under this less-than-full-probable-cause-to-arrest standard must be justified by specific and articulable facts. *Terry*, 392 U.S. at 21–22, 88 S.Ct. at 1879–81; *Ybarra*, 444 U.S. at 93–94, 100 S.Ct. at 343–44. *Ybarra* involved the patdown search of approximately 12 patrons of a tavern during the execution of a search warrant for narcotics in the tavern. During the protective patdown of Ybarra, officers discovered heroin in a cigarette pack. The Supreme Court held that the search of Ybarra violated the Fourth Amendment in that Ybarra had done nothing that indicated he was armed, nor did he act in a threatening manner. *Ybarra*, 444 U.S. at 93, 100 S.Ct. at 343.

However, the circumstances under which a search warrant is executed may give rise to articulable suspicion that an individual at the scene is armed and presently dangerous. If the suspected criminal activity to which the search warrant relates is fairly serious and

the person frisked appears to be an acquaintance of the person in possession of the premises, sufficient articulable suspicion may exist to justify a protective frisk for weapons. 2 Wayne R. LaFave, *Search and Seizure* § 4.9(d) at 639 (3d ed. 1996). LaFave further observes that it is generally known by the police and others that those who traffic in large quantities of narcotics are often armed, and the mere presence of a person or persons in such an environment presents reasonable suspicion and belief, which gives rise to sufficient justification to frisk all present for weapons. *Id.* (quoting *People v. Finn,* 73 Misc.2d 266, 340 N.Y.S.2d 807 (1973)).

The Supreme Court has considered the circumstances under which warrants to search for narcotics are executed, and commented:

> the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.

*Michigan v. Summers,* 452 U.S. 692, 702–03, 101 S.Ct. 2587, 2594, 2594, 69 L.Ed.2d 340 (1981). The Eighth Circuit noted that "[t]he possible danger presented by an individual approaching and entering a structure housing a drug operation is obvious. In fact, it would have been foolhardy for an objectively reasonable officer not to conduct a security frisk under the circumstances." *United States v. Patterson,* 885 F.2d 483, 485 (8th Cir.1989).

This court previously determined that the circumstances under which a narcotics search warrant is executed implicate a unique risk to police officers, and opined that "[t]he fact that the premises were being searched under a warrant for heroin, a very dangerous drug, gave [the police officer] the knowledge that dangerous people, who commonly carried weapons, were involved." *State v. Bitterman,* 304 Minn. 481, 485, 232 N.W.2d 91, 94 (1975) (upholding a *Terry* search of a person who arrived at an apartment that was being searched for narcotics); *see also Johantgen v. Com.,* 571 S.W.2d 110, 112 (Ky.Ct.App.

1978) ("Narcotics investigations are fraught with dangers and the officers had a right and duty to check [a person arriving on the premises] for weapons to protect themselves and others * * *."). The majority attempts to distinguish *Bitterman* by stating that somehow officers "knew" that the circumstances of that drug search were more dangerous than the circumstances here. I must disagree.

The fact that a warrant has been issued to search for narcotics at a private residence has a significant bearing on the existence of objective reasonable suspicion that a person present at the execution of the warrant may be armed and presently dangerous. *Ybarra* involved a search warrant executed in a public place—a tavern—and held the search of an individual present in the tavern invalid. 444 U.S. at 92–93, 100 S.Ct. at 343–44. *Summers,* which upheld a search of an individual present on the premises, involved a search warrant issued for a private residence. 452 U.S. at 704, 101 S.Ct. at 2595. Federal courts have made a distinction between searches conducted in public versus private places with respect to reasonable suspicion that a person is armed. A *Terry* search is permissible in a public place only with articulable suspicion as to the particular person. In a private place, a person entering establishes a more direct connection to the place and any criminal activity therein. In *United States v. Jaramillo,* the Second Circuit said:

> The difference [in the reasonableness of suspicion regarding whether a person is armed] lies in the fact that while it is obviously reasonable to believe that individuals in a private home or vehicle have some connection with one another, it is not reasonable to assume that all of the persons at a public bar have such a connection. The sole fact that an individual as to whom the officers have no reasonable and articulable factual suspicion of wrongdoing happens to be in a public place where another person possesses a weapon or contraband does not provide a basis for a *Terry*-type search if the possessor is a person with whom the searched individual has no known connection.

25 F.3d 1146, 1152 (2d Cir.1994). It follows, then, that persons arriving at a private residence are more likely to have a connection with the place and any criminal activities therein than persons arriving at a public place, such as a tavern or bar or other legitimate place of business. The Ninth Circuit observed that "[o]ne would anticipate the presence of strangers in the bar. By contrast one would expect that persons in a house or car are there by invitation or consent." *United States v. Vaughan,* 718 F.2d 332, 335 n. 6 (9th Cir.1983).

The majority also states that the threat that Wynne's unsearched purse represented was one which the officers themselves created by bringing the purse inside the house, and that therefore officers could not search the purse for weapons. If that is so, then the officers also created a threat by bringing Wynne herself into the house. Surely the majority does not believe that officers could not frisk Wynne for weapons because they brought her into the house.[1]

Because there was reasonable articulable suspicion that Wynne could be armed and presently dangerous, the rationale of *Ybarra, Summers, Terry* and *Bitterman* provides justification for detaining Wynne and for searching her for weapons. A protective search of Wynne was necessary in order to protect the officers and others from possible harm during execution of the search warrant. The state cites a number of facts in support of a conclusion that the officers had a reasonable basis to suspect that Wynne may be armed and presently dangerous. A judicial officer had determined that sufficient probable cause existed to justify issuance of a search warrant for controlled substances and related items for the entire premises of Joy Pamela Wynne's private residence, including the yard and outbuildings. The judicial officer authorized an unannounced entry of the premises in order to protect the officers executing the search. This authorization was in large part founded on Deputy Erickson's sworn affidavit that, based on his training and experience, persons actively possessing and selling controlled substances often possess firearms and other weapons. The officers were in the process of executing the search warrant when Wynne arrived on the premises. Wynne did have a direct connection to the private premises being searched. The record contains specific and articulable facts which indicate that weapons could be present at the residence, and also that a person arriving during the execution of the search warrant could be armed and presently dangerous. These facts provide sufficient justification for a protective search of Wynne.

The next question is whether the search of Wynne's purse was within the permissible limits of such a protective search. The state asserts that opening Wynne's purse did not exceed the permissible scope of a protective search for weapons because a purse is a place one would expect a woman to carry a weapon.

The purpose of a *Terry* search is not to discover evidence, but to allow a police officer to pursue an investigation without fear of violence. *Minnesota v. Dickerson,* 508 U.S. 366, 373, 113 S.Ct. 2130, 2135–36, 124 L.Ed.2d 334 (1993). A protective search must be strictly limited to that which is necessary for the discovery of weapons which might harm officers or others nearby. *Id.* If a protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid and its fruits will be suppressed. *Id.*

Other courts have observed that the search of a woman's purse is a reasonable protective measure. The Second Circuit has noted that "[a] lady's handbag is the most likely place for a woman * * * to conceal a weapon. * * * [Police] did no more than ascertain the contents of the place where she would have been most likely to hide a weapon." *United States v. Vigo,* 487 F.2d 295, 298 (2d Cir. 1973) (citations omitted). With regard to search of a purse separated from its owner, the Second Circuit observed that:

It would have been unwise for agents who lacked handcuffs and had other work to do

---

1. Wynne's counsel stated at oral argument that there were documents outside the record before this court which show that police conducted a patdown search of Wynne's person and also of the driver of the car in which she arrived at the residence.

simply to have handed [an individual] her bag and released her or to have left the bag unsearched. So long as the purse remained unopened, it was a source of danger to the agents and to the suspects as well, whose innocent or unintended gesture in the direction of the bag might have resulted in calamitous consequences.

*United States v. Barlin,* 686 F.2d 81, 87 (2d Cir.1982). These concerns are not unique to a woman's purse. For example, in North Carolina, the court of appeals determined that, where a residence was being searched for heroin, a limited frisk for weapons of all individuals present was reasonable, and that reaching into the defendant's boot was permissible, as it was "perhaps the most obvious place a weapon would have been concealed." *State v. Long,* 37 N.C.App. 662, 668, 246 S.E.2d 846, 851 (Ct.App.), *review denied, appeal dismissed,* 295 N.C. 736, 248 S.E.2d 866 (1978).

The key principle underlying Fourth Amendment protection in this context is reasonableness. *Dunaway v. New York,* 442 U.S. 200, 219, 99 S.Ct. 2248, 2260, 60 L.Ed.2d 824 (1979) (White, J., concurring); *see also* 2 Wayne R. LaFave, *Search and Seizure* § 4.9(e), at 305 & n. 80 (2d ed. 1987). Given the circumstances surrounding the execution of this search warrant, the officers, as in *Vigo,* did no more than ascertain the contents of the place where Wynne would have been most likely to hide a weapon. The search of Wynne's purse was within the bounds of a permissible search for weapons, and I would so hold.

The incriminating character of the drugs and paraphernalia seized from Wynne's purse was immediately apparent; thus, their seizure was permissible. If police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant. *Minnesota v. Dickerson,* 508 U.S. at 375, 113 S.Ct. at 2137 (citing *Horton v. California,* 496 U.S. 128, 136–37, 110 S.Ct. 2301, 2307–08, 110 L.Ed.2d 112 (1990)). Since the officers were justified in conducting a protective search of Wynne, and since they were further justified in opening and searching her purse for weapons, they were permitted to seize the drugs and paraphernalia within the purse because their incriminating character was immediately apparent.

Accordingly, I would hold that the search of Wynne's purse for weapons was a reasonable protective measure taken during the execution of a valid search warrant for controlled substances at a private residence. The police found contraband readily apparent in Wynne's purse during a legitimate search for weapons, and therefore were justified in seizing the drugs and drug paraphernalia.

COYNE, Justice (dissenting).

I join in the dissent of Justice Anderson.

STRINGER, Justice (dissenting).

I join in the dissent of Justice Anderson.