**STATE of Minnesota, Appellant,**

v.

**Donald Neil ANDERSON, Respondent.**

**No. CI–87–953.**

Court of Appeals of Minnesota.

Nov. 10, 1987.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Paul G. Morreim, Freeborn Co. Atty., Albert Lea, for appellant.

Craig S. Nelson, Albert Lea, for respondent.

Heard, considered and decided by POPOVICH, P.J., and RANDALL and MULALLY,* JJ.

## OPINION

RANDALL, Judge.

This is a state's appeal from a pretrial order suppressing evidence obtained as a

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

result of a search of respondent. The search was conducted when respondent entered a residence three hours after police arrived to execute a search warrant. The warrant to search the premises contained a clause authorizing a search of "all persons" present at the time the search was executed. This appeal is authorized by Minn.R.Crim.P. 28.04, subd. 1. We affirm.

## FACTS

The Freeborn County Sheriff's department, after receiving confidential information of cocaine and marijuana trafficking at 710 St. Thomas in Albert Lea, obtained a warrant to search the premises for drugs and paraphernalia. The search warrant affidavit stated:

Throughout the past year, information had been received from a confidential informant concerning trafficking of cocaine and marijuana at a residence, 710 St. Thomas, Albert Lea. The informant was aware of persons who had purchased drugs at 710 St. Thomas, and the informant had been at the residence on occasions and had observed illegal controlled substances there. We had been advised that persons living at the residence included JEFFREY ROBBINS and JACKIE GOODEMANN. The informant also advised that he had on occasions seen a large quantity of cocaine at 710 St. Thomas that was being prepared for resale during May of 1986. The informant also had told me that cocaine was observed at 710 St. Thomas during late 1986. I was also advised by the informant that cocaine had been seen at the residence packaged in the 1–gram quantity for resale, a folded slip of paper, within the past 48 hours. Based on the information received from the informant and also information from independent sources concerning the high traffic and activity that have been at this residence within the past year, an application for a search warrant and search warrant form were completed. The forms were taken to District Court where Judge Thomas Butler swore me under oath and reviewed them.

The warrant authorized a search of 710 St. Thomas for:

Quantities of cocaine

Quantities of marijuana

Any other Illicit controlled substances

Scales, baggies, and other devices used to package, sell or use controlled substances

Notes, ledgers, or accounts related to the sale of controlled substances

Bills, letters, or items tending to show constructive possession of the residence

Quantities of money present from drug trafficking transactions

*Any persons present at the residence at the time the search is executed*

(emphasis added). The judge signed the warrant around 2:45 p.m. When Deputy Harig and Officer Osterberg arrived at 710 St. Thomas, around 4:00 p.m. that day, they arrested the occupants of the home, Jeffrey Robbins and Barbara Madrigal (now Barbara Robbins, Jeffrey Robbins' spouse). Also present was Kevin Hedum and Robbins' young daughter. The officers searched and released Hedum.

The officers drove a vehicle, unmarked except for the words "Sheriff, Freeborn County" printed on the rocker panels beneath the two front doors. Deputy Harig was in uniform. Osterberg was in plain clothes, his gun in the holster exposed.

The officers searched the home and seized a number of items of drug paraphernalia, quantities of cocaine, a ledger detailing drug sales, and a videotape of a cocaine party held at 710 St. Thomas the previous New Year's Eve.

Around 7:00 p.m., while the officers were searching the livingroom of the home, respondent knocked on the door, and Osterberg answered. Anderson and Osterberg knew each other. When Osterberg opened the door, he told Anderson to "come on in." Anderson felt compelled to enter the home, and testified, "[W]hen an officer of the law asks you to do something * * * you have to go along with them." Osterberg testified that Anderson did not appear to be surprised at Osterberg's presence. Osterberg testified Anderson, "smiled and walked past [Osterberg] into the house."

When Anderson entered the livingroom and saw Deputy Harig, Anderson became visibly shaken. Harig told Anderson he was searching the home for cocaine, and that the search warrant for the premises authorized the officers to search anyone present at the time the officers were executing the warrant. Harig asked Anderson if Anderson was carrying any cocaine on him. Anderson replied, "no." When Harig told Anderson he was going to search him, Harig testified that Anderson was "trembling. He was real upset." When Harig asked Anderson why he was at 710 St. Thomas, Anderson responded that Barbara Madrigal invited him over for a visit.

Harig, assisted by Osterberg, searched Anderson and found a leather zipper case containing 3.1 grams of what was determined after lab analysis to be cocaine, and some cocaine paraphernalia, in Anderson's shirt pocket. The officers arrested Anderson and transported him to the station.

The officers later viewed the videotapes seized during the search. The tapes showed a number of people apparently snorting cocaine at a New Year's Eve party on the premises. The officers did not view the tape prior to their searching Anderson. During the course of the tape, Anderson is shown snorting what appears to be cocaine.

After arresting Anderson the officers obtained a warrant to search his home, where they discovered more drugs and paraphernalia. The trial court suppressed all evidence seized from the search of Anderson at 710 St. Thomas, as well as all evidence obtained from the search of Anderson's home. The state appeals only from the suppression of evidence seized during the search of Anderson's person at 710 St. Thomas.

## ISSUE

Did the trial court err by suppressing evidence seized when the officers searched respondent during a search of the premises, where the search warrant authorized a search of all persons present at the time the search was executed?

## ANALYSIS

### A. Critical Impact

The Minnesota Supreme Court has held:

[T]his court will only reverse the determination of the trial court if the state demonstrates clearly and unequivocally that the trial court has erred in its judgment and that, unless reversed, the error will have a critical impact on the outcome of the trial.

*State v. Webber*, 262 N.W.2d 157, 159 (Minn.1977). The supreme court has also noted:

Critical impact has been shown not only in those cases where the lack of the suppressed evidence completely destroys the state's case, but also in those cases where the lack of the suppressed evidence significantly reduces the likelihood of a successful prosecution.

\*　　\*　　\*　　\*　　\*　　\*

[T]he prosecution may appeal before trial from a suppression order only "where the effect is to seriously impede, although not to completely foreclose, continuation of the prosecution."

*State v. Joon Kyu Kim*, 398 N.W.2d 544, 551 (Minn.1987) (citation omitted).

We find the state has sufficiently demonstrated that suppression of the evidence seized as a result of the officers' search of respondent will have a critical impact on the state's case. Suppression of the evidence will likely foreclose prosecution of respondent. We now move to the second part of the *Webber* test, whether the trial court has erred in its judgment.

### B. Suppression of the Evidence

The trial court suppressed both the evidence seized during a search of respondent at 710 St. Thomas and the evidence seized during the subsequent search of respondent's home. The state conceded in its brief and at oral argument that it is appealing only the suppression of evidence seized from respondent at 710 St. Thomas.

The trial court found the search of respondent, conducted pursuant to the "all persons" clause contained in the warrant,

violated respondent's fourth amendment right to be free from unreasonable searches and seizures. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Under *Katz*, if a search does not come within one of the recognized exceptions, it violates the fourth amendment. Any evidence so seized must be suppressed. *See id.; Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Although they have been upheld, general "all persons" search warrants can easily be misused for overbroad searches. *State v. Hinkel*, 365 N.W.2d 774 (Minn. 1985).

The state cites several cases in support of its position that the officers' search of Anderson was lawful. Among these is *State v. De Simone*, 60 N.J. 319, 288 A.2d 849 (1972). *De Simone* involved arrests following an investigation of an illegal lottery operation where cars arrived at a shopping mall parking lot and dropped off lottery slips to defendant and a passenger parked in a car in the lot. The search warrant listed all cars alleged to be involved in the operation, including the searched car. The police searched both defendant and the passenger, and found lottery slips on the passenger. The search was upheld on the basis that the persons searched could be identified by their presence at a specific place so limited in size, where the illegality of the activity was so overt, it was likely everyone present would be a party to the offense.

*De Simone* requires a showing of a sufficient nexus between the offense taking place and the individual who is a party to it to show probable cause. *Id.* at 322, 288 A.2d at 850–851. If these requirements are met, the New Jersey court held, "[t]he evil of the general warrant is negated." *Id.*

The state also relies on *State v. Hinkel*, 365 N.W.2d 774 (Minn.1985). In *Hinkel*, the Minnesota Supreme Court adopted the *De Simone* nexus test:

whether there is sufficient particularity in the probable cause sense, that is, whether the information supplied the magistrate supports the conclusion that

it is probable anyone in the described place when the warrant is executed is involved in the criminal activity in such a way as to have evidence thereof on his person.

*Hinkel*, 365 N.W.2d at 776 (citation omitted).

In *Hinkel*, pursuant to an investigation and information from a confidential informant, police raided an "after hours joint" at which a search warrant for liquor, cards, gambling devices, weapons, drugs, and paraphernalia used for the disposition of drugs, and all other contraband was authorized by a judge. In addition, the warrant authorized a search of "all persons on the premises." *Id.* at 775. The officers discovered five packets of cocaine on Hinkel. Hinkel unsuccessfully challenged the warrant authorizing the "all persons" search. The supreme court held the "all persons" search valid because (1) the hour was late; (2) the illegal activities were carried on throughout the house; (3) there was little likelihood anyone would be in the house but to participate in the illegal activity; and (4) it was unreasonable to expect officers to name individuals in the warrant because customers varied from day to day or hour to hour. *Id.* at 776.

The state argues that the underlying facts obtained from the informant and from the police surveillance support the constitutionality of the "all persons" clause in the search warrant. Robbins' house was allegedly known to be a "drug house." The informant claimed to have seen "sale quantities" of drugs in the house. The book found in Robbins' lock box and seized by the officers contained information on drug transactions conducted between Robbins and others. The officers, the state argues, reasonably concluded persons who lived in or frequented the house were involved in drug use or trafficking.

Respondent argues the state has not met the "nexus test" and cannot meet the test unless it is probable that *everyone* in the place to be searched is likely to be involved in the criminal activity in such a way as to have evidence thereof on his person. *Hinkel*, 365 N.W.2d at 776. He claims

there was no certainty that everyone was in the house to participate in illegal activity. He points out that Jeffrey Robbins' young daughter, present when the officers arrived at 710 St. Thomas, was not searched. This is correct, but we do not base our affirmance on this isolated fact.

Respondent acknowledges that, under limited circumstances such as those in *Hinkel*, "all persons" searches have been upheld. However, he argues that the officers' search of him was a flagrant misuse of that limited authority. He contends that the warrant here was overbroad. Respondent points out that many people, including salesmen, mailmen, repairmen, friends and acquaintances, may call at a home during the daytime for legitimate reasons. The Madrigal/Robbins home at 710 St. Thomas was a standard residence in a residential neighborhood.

We agree with respondent that this case is like *State v. Robinson*, 371 N.W.2d 624 (Minn.Ct.App.1985). In *Robinson*, the police, pursuant to an "all persons" search warrant, searched patrons of the Esquire Bar during regular business hours for drugs and related items. *Id.* at 625. In *Robinson*, this court held the "all persons" warrant violated the fourth amendment. The affidavit accompanying the search warrant in that case cited as supporting fact: two controlled buys of cocaine, the presence of "lookout persons" stationed at the bar's doors, a third drug buy officers "stumbled across," and the bar's reputation as a place where controlled substances would be present at any time. *Id.* There, the supporting affidavit and the factual background, like here, did not justify an all persons warrant without more as to each and every entrant.

We conclude the nexus test has not been met here. This case is not similar to *Hinkel*. Unlike the after hours establishment in *Hinkel*, this was a search of a house used as a residence in a residential neighborhood. The search was conducted in the afternoon. Thus, there could be no inference that everyone coming into the house could reasonably be suspected of criminal activity. As respondent noted, any number of people, for example, paper boys, deliverymen, mailmen, friends, or relatives, could have had legitimate reasons for being on the premises. Respondent testified that he was on the premises at the invitation of his friend, Barbara Madrigal.

In an "after hours" establishment at 1:00 a.m., after the bars have closed, the court in *Hinkel* drew the inference that no one present on the premises would likely be there for legitimate reasons. The *Hinkel* court inferred from the facts that anyone in an after hours establishment where illegal sales of liquor and drugs occur, in addition to other criminal activities, could reasonably be the focus of suspicion. The same cannot be said of the present case. We find it significant that the same judge who signed the search warrant in contention is the judge who suppressed the evidence seized.

Another factor weighing in our decision is that respondent did not arrive on the premises immediately after the police did. Respondent arrived three hours later, as the police were preparing to leave. Arguably, the warrant was no longer being executed when respondent entered the premises, although we do not rest our affirmance on this basis.

The state admits that the warrant did not give the officers the right to search, at any time, anyone that was present in Robbins' house while the police were there. If a person were to enter the home while the search was in progress, the state concedes the officers would need some *additional* evidence to support their suspicion that that person was involved in drug related activity before a search could be conducted.

The state argues that some additional evidence supported their suspicion respondent was involved in drug related activity. They argue respondent's nervousness and trembling when he entered the premises, and when he learned he would be searched, is sufficient. This kind of evidence is subjective and speculative. We cannot say that the trial judge was clearly erroneous in determining that respondent's later entrance into the house, together with some alleged nervous gestures, was not suffi-

cient additional evidence to justify the search. The trial court heard testimony of respondent and other witnesses and was in the best possible position to judge their credibility. We do not disturb the rule that the officers did not have a reasonable suspicion to justify searching respondent.

We hold the trial court did not err by suppressing the evidence.

### DECISION

The trial court order is affirmed in all respects.

Affirmed.