2000 SD 113

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Dawn JACKSON, Defendant and Appellant.**

No. 21014.

Supreme Court of South Dakota.

Argued Jan. 11, 2000.

Decided Aug. 23, 2000.

Mark Barnett, Attorney General, Timothy G. Bartlett, Assistant Attorney General, Pierre, South Dakota, Attorneys for plaintiff and appellee.

John R. Murphy, Rapid City, South Dakota, Attorney for defendant and appellant.

KONENKAMP, Justice.

[¶ 1.] Dawn Jackson sought admittance to a house while it was being searched under the authority of an "all persons" search warrant. She was searched and officers found illegal substances in her purse. Her motion to suppress was denied and she was convicted of drug offenses. We must decide if the affidavit in support of the search warrant was adequate to show probable cause for the issuance of an "all persons" warrant. We conclude that as applied to Jackson the warrant was valid because she sought entry to a private house at night while it was being lawfully searched, and the warrant's inclusion of all persons arriving at the residence during the search was not overbroad in view of the occupants' history of illicit drug activity.

## Background

[¶ 2.] During a traffic stop on September 30, 1998, South Dakota Highway Patrol troopers discovered a small amount of methamphetamine in the motorist's vehicle. Chad Evans, a Division of Criminal Investigations special agent, was called to the scene to interview the driver. Evans learned that the driver had purchased the methamphetamine from a person named Scott Mallula the previous day, at Mallula's residence in Rapid City. The driver also told Evans that he had known Mallula for about four years and that he had purchased methamphetamine from him on six other occasions. He described for the officers where Mallula currently lived, and accompanied them to identify the residence at 105 E. Monroe Street as Mallula's house. The driver, now informant, agreed to try to make a controlled methamphetamine purchase from Mallula at the residence. He was successful, buying one gram of methamphetamine for $100.

[¶ 3.] The following day, Evans sought a search warrant to search the residence where Mallula and his girlfriend, Bobbie Maurer, lived. The affidavit supporting the warrant set out, among others, the following facts:

(1) On April 9–10, 1997, Evans assisted in a consent search of Mallula and Maurer's residence at 4003 Sunset Drive, Rapid City, where residue amounts of methamphetamine and marijuana, drug paraphernalia, and what appeared to be documentation of drug activity were found.

(2) On January 1, 1998, Evans executed a search warrant at the then current residence of Mallula and Maurer, at 220 Federal Avenue, Rapid City, where he found residue amounts of methamphetamine and marijuana, drug paraphernalia, and what appeared to be documentation of drug activity, including drug transactions and money accounts.

(3) On September 30, 1998, the informant was found to be in possession of a

small amount of methamphetamine during a traffic stop.

(4) The informant told Evans he had purchased the methamphetamine in his possession from Mallula at Mallula's residence the previous day, and that he has known Mallula for approximately four years and had bought methamphetamine from him about six times.

(5) The informant pointed out Mallula and Maurer's residence at 105 E. Monroe Street; he identified the automobile parked there as owned by the couple and also pointed out a former residence of the couple—information which was confirmed.

(6) The informant made a controlled purchase of a gram of methamphetamine at the residence using previously recorded DCI funds.

(7) Evans was not aware of ever meeting the informant before; the informant told Evans he had been released from the South Dakota State Penitentiary earlier in the year and wanted to cooperate in an effort to not be sent back to prison; no deal was made, but Evans told the informant that the informant's cooperation would be made known to the prosecutor.

[¶ 4.] Evans also added a number of opinions based upon his training and experience:

(1) Individuals who possess controlled substances often sell them to support their habit and to make a profit.

(2) Individuals who possess or distribute marijuana and/or other controlled substances also often possess or distribute other controlled substances.

(3) Individuals who possess or distribute drugs often possess drug paraphernalia.

(4) Individuals who distribute controlled substances often keep records of the transactions; possess firearms to protect themselves and to deter law enforcement; and use vehicles to both transport and store the drugs, paraphernalia, and proceeds.

(5) Individuals who occupy homes where controlled substances are stored often have those substances on them.

[¶ 5.] Based on this affidavit, a circuit judge issued a search warrant on October 1, 1998. It authorized the search of the dwelling, all outbuildings at the residence, the vehicle belonging to the couple, the persons of Mallula and Maurer, all persons at the residence when the warrant is executed as well as the vehicles driven by those individuals "if they are parked in the vicinity of the residence," and "[a]ll persons arriving at this residence during the execution of the search warrant and the vehicles that they arrive in." The warrant ordered a search for controlled substances, marijuana, drug paraphernalia, records relating to distribution of drugs, firearms, and U.S. currency, as well as blood and urine samples from Mallula and Maurer. The court allowed the warrant to be executed without notice at any time of the day or night.

[¶ 6.] That same evening, beginning at 8:30 p.m., the warrant was executed. While the search was proceeding, Jackson and a friend arrived at the residence. They knocked at the door and were greeted by DCI agents. As authorized by the warrant, the two were then searched, including their purses. The agents found a small amount of marijuana, a snort tube, and a quarter gram of amphetamine in Jackson's purse. She was charged with possession of a controlled substance, in violation of SDCL 22–42–5; possession of two ounces or less of marijuana, in violation of SDCL 22–42–6; and possession of drug paraphernalia, in violation of SDCL 22–42A–3.

[¶ 7.] Jackson moved to suppress. Her motion was denied. She was convicted of all three charges against her and was sentenced to four years in the South Dakota State Penitentiary. She now appeals, challenging the sufficiency of the affidavit in support of the search warrant, and questioning whether the court erred in considering new information at the sup-

pression hearing not supplied at the time the search warrant was sought.

## Standard of Review

[¶ 8.] Although our standard of review is highly deferential, we do not examine challenges to the sufficiency of search warrants under the abuse of discretion standard; rather, we review such challenges by looking at the totality of the circumstances to decide if there was at least a "substantial basis" for the issuing judge's finding of probable cause. *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548 (1983) (citations omitted). Our inquiry is whether the information provided to the judge was sufficient for a "common sense" decision that there was a "fair probability" the evidence would be found on the persons or at the place to be searched. *Id.* Furthermore, we review the issuing judge's probable cause decision to grant a search warrant independently of the conclusion reached by the circuit court in the suppression hearing. *See United States v. Hibbard*, 963 F.2d 1100, 1101 (8th Cir. 1992); *United States v. Anderson*, 933 F.2d 612, 614 (8th Cir.1991).

[¶ 9.] Reviewing courts are not empowered to conduct an after-the-fact de novo probable cause determination; on the contrary, the issuing judge's legal basis for granting the warrant is examined with "great deference." *Gates*, 462 U.S. at 236, 103 S.Ct. at 2331, 76 L.Ed.2d at 547. "A deferential standard of review is appropriate to further the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." *Massachusetts v. Upton*, 466 U.S. 727, 733, 104 S.Ct. 2085, 2088, 80 L.Ed.2d 721, 727 (1984). Under the *Gates* standard, an "informant's reliability, veracity, and basis of knowledge are relevant considerations—but not independent, essential elements—in finding probable cause." *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir.1986).

## Analysis and Decision

### 1. Extraneous Evidence in Suppression Hearing

[¶ 10.] Jackson contends that during the hearings on the motion to suppress, the circuit court considered information that was not presented in Evans' affidavit. She characterizes this extraneous information as "highly inflammatory, prejudicial speculation." During these hearings, the court and counsel discussed various hypothetical circumstances encompassing the right to search persons arriving on the scene of a search being conducted with a search warrant. Whatever conclusions these remarks may have generated, they have no bearing on our independent review of the affidavit. Thus, Jackson's complaints in this respect are pointless.

[¶ 11.] "The determination of whether an affidavit in support of a search warrant shows probable cause for issuance of the warrant must be based upon an examination of the four corners of the affidavit." *State v. Lodermeier*, 481 N.W.2d 614, 622 (S.D.1992) (quoting *State v. Iverson*, 364 N.W.2d 518, 522 (S.D. 1985)); *State v. Smith*, 281 N.W.2d 430, 433 (S.D.1979). Reasonable inferences may be drawn from the information in the affidavit. *Lodermeier*, 481 N.W.2d at 622 (citing *State v. Kaseman*, 273 N.W.2d 716, 722–23 (S.D.1978)). When reviewing a judge's probable cause determination, the only evidence to be considered is what was before the judge at the time the application was made. *Smith*, 281 N.W.2d at 433 (citing *State v. Gerber*, 90 S.D. 432, 241 N.W.2d 720 (1976)). "Therefore, the existence of probable cause for the search warrant must rise or fall on the affidavit itself which was the only evidence presented to the magistrate for his determination of probable cause." *Id.; State v. Gage*, 302 N.W.2d 793, 796–97 (S.D.1981).

### 2. Probable Cause to Issue "All Persons" Search Warrant

[¶ 12.] Jackson asserts that there was insufficient probable cause presented

to the judge to support the issuance of an "all person" warrant. A prerequisite to the issuance of such a warrant, she suggests, is that the affidavit must show that the place to be searched is used solely for illegal purposes and that every person present at the location will possess incriminating evidence. The State contends that it was reasonable to infer that persons arriving at this residence at the time the search was conducted would probably be involved in illegal drug activity themselves.[1]

■■■■■■■ [¶ 13.] We have not previously reviewed a challenge to an "all persons" search warrant. Generally, before any search warrant may be issued, there must be a finding of probable cause, supported by an affidavit describing with particularity the place and person to be searched. U.S. Const. amend. IV; S.D. Const. art. VI, § 11. The Fourth Amendment requires "a nexus ... between the item to be seized and criminal behavior." *Warden v. Hayden*, 387 U.S. 294, 307, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782, 792 (1967). Some courts condemn warrants directing a search of "any and all persons" because they constitute general warrants authorizing the indiscriminate searching of people without naming or describing anyone. *Crossland v. State*, 266 P.2d 649, 652 (Okla.Crim.App.1954); *see* Wayne R. La-Fave, Search and Seizure § 4.5(e), at 545–46 (3rd ed. 1996). Other courts do not forbid these warrants, finding that "it is no longer an open question" that such warrants are valid; the only question is the existence of probable cause to justify them. *State v. Doyle*, 918 P.2d 141, 143 (Utah Ct.App.1996). *See State v. Hinkel*, 365 N.W.2d 774 (Minn.1985); *State v. De Simone*, 60 N.J. 319, 288 A.2d 849 (N.J. 1972); *People v. Nieves*, 36 N.Y.2d 396, 369 N.Y.S.2d 50, 330 N.E.2d 26 (1975); *Commonwealth v. Graciani*, 381 Pa.Super. 626, 554 A.2d 560 (1989); *State v. Blevins*, 968 P.2d 402 (Utah Ct.App.1998); *Morton v. Commonwealth*, 16 Va.App. 946, 434 S.E.2d 890 (1993).

■■■ [¶ 14.] In our view, "all persons" warrants will not perforce offend the particularity requirement of the Fourth Amendment. *See State v. Horn*, 15 Kan. App.2d 365, 808 P.2d 438, 439 (1991). Instead, the validity of an "all persons" warrant—like the validity of any search warrant—depends on the probable cause offered to support it. *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238, 245 (1979); *see Marks v. Clarke*, 102 F.3d 1012, 1029 (9th Cir. 1996). In *DeSimone*, a decision frequently cited in analyzing "all persons" search warrants, the court explained:

On principle, the sufficiency of a warrant to search persons identified by their presence at a specified place should depend upon the facts. A showing that lottery slips are sold in a department store or an industrial plant obviously would not justify a warrant to search every person on the premises, for there would be no probable cause to believe that everyone there was participating in the illegal operation. On the other hand, a showing that a dice game is operated in a manhole or in a barn should suffice, for the reason that the place is so limited and the illegal operation so overt that it is likely that everyone present is a party to the offense. Such a setting furnishes not only probable cause but also a designation of the persons to be searched which functionally is as precise as a dimensional portrait of them.

\* \* \*

SD 82, ¶ 26, 551 N.W.2d 571, 577. *See also People v. Titus*, 880 P.2d 148, 152 (Colo.1994) (issue of good faith of affiant not raised before trial court so not properly before the appellate court); *State v. Gogg*, 561 N.W.2d 360, 368 (Iowa 1997) (issue of the good faith exception not preserved).

---

1. The State argues that even if we find the warrant was overbroad, the evidence should not be suppressed because the officers executed the warrant in good faith. This issue was not presented to the trial court and thus we decline to consider it. *See City of Watertown v. Dakota, Minnesota & Eastern R. Co.*, 1996

And, with regard to the Fourth Amendment demand for specificity as to the subject to be searched, there is none of the vice of a general warrant if the individual is thus identified by physical nexus to the ongoing criminal event itself. In such a setting, the officer executing the warrant has neither the authority nor the opportunity to search everywhere for anyone violating a law. So long as there is good reason to suspect or believe that anyone present at the anticipated scene will probably be a participant, presence becomes the descriptive fact satisfying the aim of the Fourth Amendment. The evil of the general warrant is thereby negated. To insist nonetheless that the individual be otherwise described when circumstances will not permit it, would simply deny government a needed power to deal with crime, without advancing the interest the Amendment was meant to serve.

*DeSimone,* 288 A.2d at 850–51.

■■■ [¶ 15.] The question, therefore, is whether the affidavit gave sufficient particularity to conclude that there was good reason to believe that anyone present would probably be a participant in the illegal drug activities at Mallulla and Maurer's house. *See* LaFave, *supra,* § 4.5(e) at 547. The key to assessing an "all persons" warrant is to examine whether there was a "sufficient nexus among the criminal activity, the place of the activity, and the persons in the place to establish probable cause." *People v. Johnson,* 805 P.2d 1156, 1159 (Colo.Ct.App.1990). Those courts upholding "all persons" warrants find such nexus and those courts striking them down conclude no such nexus was shown. *See id.* at 1160 (collecting cases).

■■■ [¶ 16.] Based on several factors, we conclude that the "all persons" warrant was legitimate in this case. Agent Evans, the law enforcement officer who submitted the affidavit, documented the actuality of persistent drug dealing activity by Mallula and Maurer from their present and prior homes. The informant told Agent Evans that he had just purchased illicit drugs from Mallula at his present address. Also, the informant said he had made similar purchases on six earlier occasions at Mullula's prior residences. This informant's reliability was immediately confirmed with a controlled buy at the Monroe Street residence. The earlier purchases were circumstantially verified by Agent Evans' own observation of drug dealing materials found in his searches of the prior residences.

[¶ 17.] Of course, the number of purchases the informant reported could not be precisely confirmed. This informant, recently released from prison, had a strong impetus to exculpate himself as he faced returning to the penitentiary. However, as the Supreme Court explained in *Gates,* "even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case." 462 U.S. at 234, 103 S.Ct. at 2330, 76 L.Ed.2d at 545. Moreover, the information given by this informant confirmed criminal activity previously known to Agent Evans, and the substance of this information was independently corroborated.

[¶ 18.] In *State in Interest of L.Q.,* 236 N.J.Super. 464, 566 A.2d 223 (Ct.App.Div. 1989), the affidavit in support of the "all persons" search warrant stated that a "reliable confidential source" had reported that cocaine was being sold inside a residence. Sporadic surveillance of the house revealed that persons came to the house and stayed for only a short time, which according to law enforcement experience was typical of houses where narcotics were being sold. A successful controlled cocaine purchase was accomplished at the subject house. Additionally, officers observed a lookout posted to warn those in the house of police presence in the neighborhood. The court upheld the warrant:

The evidence was sufficient to create a well-grounded suspicion or belief that numerous sales of [drugs] were being conducted in the premises. Although the affidavit did not exclude the possibility of other activities on the premises, the description of the activity actually observed provided a firm foundation for the suspicion or belief that any person in the private premises was involved in the overt unlawful activity of sale and possession of cocaine. Such a suspicion or belief is not limited to persons already there when the police arrive, but reasonably extends to a person who enters the premises during the search.

*Id.* at 226 (footnote omitted).

[¶ 19.] We think it important that the search was of a private house, not a public business or multi-family dwelling where innocent persons might more likely be subject to an unjustified search. The persons living at 105 E. Monroe Street were Mallula and Maurer, both indisputably involved in long-term illicit drug activity. In *Hinkel* an "all persons present" search warrant was upheld as "the police were dealing with illegal afterhours activity in a house" where it would be unlikely that nonparticipants in the unlawful activity would be present. *Hinkel,* 365 N.W.2d at 776. *See also Morton,* 434 S.E.2d at 893 (upholding "all persons present" search warrant of "private apartment"). The Massachusetts Supreme Judicial Court uses a three-factor approach in evaluating the validity of these warrants:

> ■ the premises or area to be searched are small, confined and private; [2] the nature of the criminal activity is such that the participants (in general) constantly shift or change so that it is, practically, impossible for the police to predict that any specific person or persons will be on the premises at any given time; and [3] the items specifically described in the warrant as the target of the search are of a size or kind which renders them easily and likely to be concealed on the person.

*Commonwealth v. Smith,* 370 Mass. 335, 348 N.E.2d 101, 107 (1976), *cert. denied,* 429 U.S. 944, 97 S.Ct. 364, 50 L.Ed.2d 314 (1976) (footnote omitted). Other decisions have endorsed this approach. *Blevins,* 968 P.2d at 404; *State v. Covington,* 904 P.2d 209, 212 (Utah Ct.App.1995).

[¶ 20.] Another factor leading us to uphold this warrant is that it was executed at night, making it improbable that innocent people would show up by happenstance. The search did not begin until 8:30 p.m. on October 1, 1998. Jackson arrived sometime after that. *See Hinkel,* 365 N.W.2d at 776 (late night search makes it unlikely that nonparticipants would be present). Compare this circumstance with those cases striking down "all persons" warrants because the search took place "during the afternoon when any number of people could legitimately be there." *State v. Otis,* 487 N.W.2d 928, 931 (Minn.Ct.App.1992); *State v. Anderson,* 415 N.W.2d 57, 61 (Minn.Ct.App.1987). Unlike this case, in *State v. Wynne,* 552 N.W.2d 218 (Minn. 1996) the Minnesota Supreme Court ordered the suppression of evidence seized with an "all persons" search warrant because "[b]y the terms of the search warrant, it was to be executed only during daytime hours. During the day, relatives, guests or hired workpeople could have been present on the residential premises to be searched." *Id.* at 221.

[¶ 21.] Jackson contends that there was no proof of sufficient numbers of drug sales at 105 E. Monroe Street to justify a belief that all persons coming to the residence would probably be involved in drug activity. Over the years, Mallula and Maurer lived in different residences. Yet their drug activity continued. That some of these activities occurred at their previous dwellings does not weaken the probable cause for an "all persons" search at their latest home; it strengthens it, as it shows persistent illegal enterprise no matter where they resided. Furthermore, volume of drug activity is not the test.

[¶ 22.] What amount of evidence is required to form probable cause is not a question susceptible to formulaic solutions. *People v. Fino*, 14 N.Y.2d 160, 250 N.Y.S.2d 47, 199 N.E.2d 151, 153 (1964). Probable cause "is a fluid concept—turning on the assessment of probabilities in particular contexts—not readily, or even usefully, reduced to a neat set of [legal] rules." *State v. Farndon*, 22 Ohio App.3d 31, 488 N.E.2d 894, 898 (1984) (quoting *Gates*, 462 U.S. at 232, 103 S.Ct. at 2329, 76 L.Ed.2d at 544). It includes a balancing of the government's need to enforce the law with a citizen's right to privacy, and must endeavor to accommodate those interests, often at odds with each other, to serve both while attempting not to obstruct either. *State v. Kasabucki*, 52 N.J. 110, 244 A.2d 101, 104 (N.J.1968).

[¶ 23.] We agree that "all persons" warrants require greater factual support than other warrants. *See Nieves*, 369 N.Y.S.2d 50, 330 N.E.2d at 34. However, to hold that an affidavit must contain facts showing that nothing but illegal activity is taking place in a location before an "all persons" warrant may be issued "would simply deny government a needed power to deal with crime, without advancing the interest the [Fourth] Amendment was meant to serve." *See De Simone*, 288 A.2d at 851. We cannot compare the probable cause supplied in large cities where "crack houses" exist and where the volume of drug dealing far exceeds what occurs in South Dakota. Probable cause is a common sense determination based on the totality of circumstances as they exist in the locality.

[¶ 24.] The issuance of an "all persons" search warrant does not require a guarantee that everyone who might appear during the search must be involved in drug activity. That is too high a burden. As one court explained:

> Though it is certainly possible, even probable, that innocent third parties who happen to be at the wrong place at the wrong time may be subjected to searches under such warrants, the nexus between the person to be searched and the nature and the seriousness of the criminal conduct suspected on probable cause, nonetheless, renders the *probability* of their culpable participation in the crime suspected sufficient to warrant a search of their person....

*Graciani*, 554 A.2d at 562–63.

[¶ 25.] We do not sanction the routine use of "all persons" warrants. However, we uphold the warrant in this case because the facts to support it include: (1) proof of the sale of a controlled substance at the residence within twenty-four hours before the warrant was issued; (2) a reliable indication of six earlier purchases of drugs from the same persons by the same informant who made the controlled buy; (3) two law enforcement searches of the suspects' prior residences indicating not only the presence of drugs but also evidence of ongoing drug dealing activity; (4) the search of a private dwelling, rather than a multi-family residence or business where innocent persons would more likely be present; (5) the nature of the criminal activity was such that participants constantly shifted or changed making it practically impossible for law enforcement to predict that any specific person or persons would be on the premises at any given time; (6) the search was conducted at a time of day when it was unlikely that innocent citizens would arrive at the residence; and (7) the subject of the search was illicit drugs which can be easily hidden on a person's body. *See Morton*, 434 S.E.2d at 892–93 *and Commonwealth v. Heidelberg*, 369 Pa.Super. 398, 535 A.2d 611, 615 (1987) (using similar factors to uphold "all persons" warrants). Examining the issuing judge's probable cause determination with great deference, we conclude that there was at least a substantial basis for finding that grounds existed for the issuance of the "all persons" search warrant.

[¶ 26.] Affirmed.

[¶ 27.] MILLER, Chief Justice, and GILBERTSON, Justice, concur.

[¶ 28.] SABERS and AMUNDSON, Justices, dissent.

SABERS, Justice (dissenting).

[¶ 29.] The Fourth Amendment directs that "no Warrants shall issue but upon probable cause ... and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. As a general rule, "open-ended" or "general" warrants are constitutionally prohibited. *Ybarra v. Illinois*, 444 U.S. 85, 92 n. 4, 100 S.Ct. 338, 342 n. 4, 62 L.Ed.2d 238, 246 n. 4 (1979) (citations omitted). Thus, particularity in a search warrant is required to ensure that the executing officer can reasonably ascertain and identify the persons or places authorized to be searched and the objects to be seized. "To protect the right of privacy from arbitrary police intrusion, ... nothing should be left to the discretion of the searcher in executing the warrant." *People v. Nieves*, 36 N.Y.2d 396, 369 N.Y.S.2d 50, 330 N.E.2d 26, 31 (1975) (citations omitted).

[¶ 30.] When granting a search warrant, our state and federal constitutions also require that sufficient probable cause exist "to believe that the property described in the warrant will be found at the specified premises and in [the] possession of the persons so described." *State v. Sims*, 75 N.J. 337, 382 A.2d 638, 643 (1978). This probable cause must be "particularized to every person or place to be searched;" therefore, "a warrant authorizing the search of premises does not authorize officers to search an individual merely because that person is present on the premises[.]" *State v. Ayala*, 762 P.2d 1107, 1111 (Utah Ct.App.1988), *cert. denied*, 773 P.2d 45 (Utah 1989). *See also Lippert v. State*, 664 S.W.2d 712, 721 n. 12 (Tex.Crim. App. 1984) (stating that " '[b]efore an officer places a hand on the person of a citizen in search of anything, he must have consti-

tutionally adequate grounds for doing so.' ").

'A person's mere presence at the scene of suspected criminal activity does not entitle police officers to search that individual.... Absent some independent factors tying [the defendant] to the illegal activities on the premises, it was no more likely he was engaged in the criminal enterprise than that he was an innocent visitor on the premises.'

*Id.* at 720 (quotation omitted). Accordingly, an "all persons" search warrant is "scrutinized strictly on a case-by-case basis to ensure that the specificity requirement of the [F]ourth [A]mendment is not violated." *Commonwealth v. Gilliam*, 522 Pa. 138, 560 A.2d 140, 142 (1989). In determining if this specificity requirement is met

[T]he question is whether there is sufficient particularity in the probable cause sense, that is, whether the information supplied the magistrate supports the conclusion that it is probable anyone in the described place when the warrant is executed is involved in the criminal activity in such a way as to have evidence thereof on his person. If the evidence tendered to the magistrate supports such a conclusion, then the search-all-persons-present warrant is unobjectionable. If the evidence does not support such a conclusion, then the searches of those present find no justification in the search warrant.

*People v. Johnson*, 805 P.2d 1156, 1160 (Colo.App.1990) (quoting 2 Wayne LaFave, Search & Seizure § 4.5(e) at 231 (1978)).

[¶ 31.] This case involves the unique situation where a warrant is issued to search a specified place and "[a]ll persons arriving at this residence during the execution of the search warrant and the vehicles that they arrive in." This is unique because,

[i]f there is probable cause to believe that a certain individual has on his person the evidence, fruits, or instrumentalities of crime, it would be an unusual case in which there was not also proba-

ble cause to believe that this individual was a participant in the criminal activity under investigation. Thus, the more usual procedure is simply to arrest that person and then search him incident to the arrest.

2 Wayne R. LaFave, Search and Seizure § 4.5 at 89 (1978). As these unique situations become more frequent, it becomes increasingly important to protect the public's Fourth Amendment guarantees. Thus, there must be a showing of "individualized probable cause" that the premises were confined to illegal activity and that there was a substantial probability that all persons present at the time of execution would possess the items sought. The "paramount concern" is whether, *at its inception*, the warrant, including the showing on which it was based, satisfies fundamental constitutional requirements, including the Fourth Amendment. Therefore, we must look at the information available to the magistrate who issued the "all persons" search warrant. *See State v. Thomas*, 540 N.W.2d 658, 662 (Iowa 1995) (providing that " 'a defective warrant cannot be resuscitated by consideration of additional information now available or even of information available when the warrant was obtained but which was not communicated to the magistrate.' ") (quoting 1 Wayne R.

LaFave, Search and Seizure § 3.1(d) (2d ed.1987)).

[¶ 32.] Here, Jackson was not a particularized target of the warrant and was not specifically mentioned in the affidavit supporting the warrant. Within the affidavit in support of the search warrant, there was no showing that she was committing or about to commit any crime, nor that she was under the influence of drugs or alcohol. There was no showing of any prior criminal record on her part. There was no showing that the drugs found in her purse were previously purchased at the Mallula home. In fact, there was no showing that the police conducted a surveillance and observed any drug activity from the Mallula home except for one controlled sale they conducted. There was no showing that persons who frequent the Mallula home possess or purchase drugs. Consequently, the affidavit failed to establish individualized probable cause to believe that "all persons" who would arrive at the Mallula home would be connected with the criminal activity.[2] Given these facts, probable cause to search Jackson was lacking:

> All we have in this case is a residence where some drug sales have been made, presumably by the owner or lessee, and where some unquantified amount of drugs is probably stored in an unknown manner. It does not follow from this

---

**2.** This case may be different if Jackson were already present in the Mallula home when law enforcement arrived to execute the search warrant because then, the fact that "drugs can be easily hidden on a person's body" may be relevant. However, Jackson *arrived* at the Mallula home while the execution of the warrant was in progress. Therefore, this factor can not be used to support this warrant.

As for the time of day this warrant was executed, it was not shown that casual visitors were less likely to be present in the Mallula home at 8:30 p.m. In fact, 8:30 p.m. is not a late hour to have casual visitors. Regardless, the time of day of execution is not "sufficiently probable, or even more than possible, that those present at this time were affiliated with illicit drug activity." *Gilliam*, 560 A.2d at 143. Furthermore, this warrant could have been executed at any time without notice. Therefore, the majority opinion's analysis of

this factor is irrelevant because we must review the information *presented to the magistrate* and determine whether probable cause existed *at the time the magistrate issued the search warrant.*

The majority opinion also states that "the subject of the search was illicit drugs which can be easily hidden on a person's body." It claims that this is another factor to support a determination of probable cause. However, there is no mention of this within the affidavit, therefore, "we cannot ... consider this in making our determination whether probable cause existed to support the scope of the warrant to search all persons present [or arriving]" on the premises. *Thomas*, 540 N.W.2d at 662. *See id.* at 665 (stating that such testimony is "entirely irrelevant to a reviewing court ... as we are bound by the information provided to the issuing magistrate and may consider nothing more.").

that any person present at the residence, even after midnight, is *probably* involved in illegal activity. It was certainly reasonable to search the premises, but it was not reasonable to search unnamed persons who might be found on the premises merely because drugs had been recently sold and stored there. It is not enough that persons present [or arriving] *might* be involved.

*Gilliam,* 560 A.2d at 143 (emphasis in original).

[¶ 33.] The affidavit only reflected that the informant purchased methamphetamine from Mallula six times in the prior four years and that there was a recent controlled purchase of one gram of methamphetamine from Mallula. It then set forth five generalized statements about mannerisms of people who use drugs:

(1) Individuals who possess controlled substances often sell them to support their habit and to make a profit.

(2) Individuals who possess or distribute marijuana and/or other controlled substances also often possess or distribute other controlled substances.

(3) Individuals who possess or distribute drugs often possess drug paraphernalia.

(4) Individuals who distribute controlled substances often keep records of the transactions; possess firearms to protect themselves and to deter law enforcement; and use vehicles to both transport and store the drugs, paraphernalia, and proceeds.

(5) Individuals who occupy homes where controlled substances are stored often have those substances on them.

Obviously, this affidavit contained *nothing* to establish that the individuals therein who possessed drugs tended to associate with other individuals who used or possessed drugs. It also failed to mention that people who frequented the home were known to possess or purchase illegal drugs. *See Ybarra,* 444 U.S. at 90–91, 100 S.Ct. at 342, 62 L.Ed.2d at 245 (holding

that there was no probable cause to search the defendant because the warrant application failed to allege that the premises were frequented by patrons who purchased illegal drugs).

[¶ 34.] While the affidavit supports the conclusion that the *occupants* of the Mallula home are engaged in illegal activity, "it does not support the conclusion that only illegal conduct occurs on the site, and that therefore any person present [or arriving] is likely to be 'involved in the criminal activity in such a way as to have evidence of the criminal activity on h[er] person.'" *State v. Carter,* 79 Wash.App. 154, 901 P.2d 335, 339 (1995) (quoting *Stokes v. State,* 604 So.2d 836, 838 (Fla.Ct.App. 1992)). In other words, "the necessary nexus between all persons present, the place, and the criminal activity ... [was] absent," *id.,* and Jackson's Fourth Amendment right to unreasonable search and seizure was violated. *See Nieves,* 369 N.Y.S.2d 50, 330 N.E.2d at 34 (providing that the affidavit in support of the search warrant must include: (1) the character of the premises, including its location, size and public or private character; (2) the nature of the alleged illegal conduct; (3) the number and behavior of persons expected to be present when the warrant is to be executed; (4) whether any persons unconnected with the alleged illegal activity have been seen on the premises; and (5) the precise area and time in which the alleged activity is to take place). While it may have been easy to be more specific in the affidavit, the fact is that the information presented to the magistrate was insufficient to establish probable cause for an "all persons" search warrant.

[¶ 35.] The State argues that is was "reasonable to infer that persons arriving at this residence at the time the search was conducted would probably be involved in illegal drug activity themselves." However, this general statement was clearly not included within the affidavit in support of the warrant. Therefore, it cannot be used to support this warrant. *See Thom-*

*as,* 540 N.W.2d at 665 (stating that such information is "entirely irrelevant to a reviewing court … as [it is] bound by the information provided to the issuing magistrate and may consider nothing more."). Furthermore, "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra,* 444 U.S. at 91, 100 S.Ct. at 342, 62 L.Ed.2d at 245 (citation omitted).

[¶ 36.] As noted in the majority opinion, the State failed to present the good faith exception to the trial court. Therefore, we should reverse and remand.

[¶ 37.] AMUNDSON, Justice, joins this dissent.